15 P.3d 115 (2000)
142 Wash.2d 654
WEYERHAEUSER COMPANY, Respondent/Cross-Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, Appellant/Cross-Respondent.
No. 67694-1.
Supreme Court of Washington, En Banc.
Argued May 9, 2000.
Decided December 21, 2000.
As Amended January 16, 2001.
*119 Cusack & Knowles, Kenneth James Cusack, William Frank Knowles, Barney Jay Mason, Seattle; Johns, Monroe, Mitsunaga, Robert D. Johns, Bellevue; Reed, McClure, Greg Montgomery, Mary R. DeYoung, Seattle, for Appellant.
Gordon, Murray, Tilden, Charles Cooper Gordon, Jeffrey Iver Tilden, Jeffrey M. Thomas, Seattle; Gabriel F. Gedvila, Federal Way; Eugene R. Anderson, Robert M. Horkovich, William G. Passannante, Anderson Kill & Olick, P.C., New York, New York, Counsel for Respondent.
Davis, Wright, Tremaine, Thomas Stephens James, Jr., Seattle, Amicus Curiae on Behalf of Insurance Environmental Litigation.
Mills, Meyers, Swartling, David MartinSchoeggl; Lane, Powell, Spears, Lubersky, Cathy Ann Spicer, D. Joseph Hurson, Seattle, Amicus Curiae on Behalf of Certain Underwriters at Lloyd's. *116 *117
*118 SANDERS, J.
Massive costs associated with hazardous waste cleanup prompt this litigation between insured and insurer to allocate financial responsibility pursuant to the terms and conditions of an insurance contract. The trial court resolved most claims on summary judgment, the remainder at trial. Neither party is satisfied. Commercial Union Insurance Co. (CU) appeals and Weyerhaeuser cross-appeals the resulting final judgment. The Court of Appeals certified this proceeding to the Supreme Court for direct review and we accepted. Ruling Accepting Certification, No. 67694-1 (Mar. 8, 1999). In part we agree with the learned trial judge, but in part we do not. A number of issues are presented which we must resolve.
We affirm the trial court and hold: (1) the supplemental policy does not create a property damage aggregate limit; (2) CU is not entitled to offset settlements Weyerhaeuser received from other insurers; (3) CU is obligated to provide coverage for the Mid State and Pasco sites; (4) the admission of expert testimony was proper; and (5) Weyerhaeuser is entitled to prejudgment interest for the five sites with liquidated damages. However we partially reverse the trial court to hold: (1) CU is entitled to a $500,000 per incident setoff against the underlying policy; (2) Weyerhaeuser is not entitled to prejudgment interest for (a) sites where damages are not liquidated, or (b) its award of attorneys' fees; and (3) a material issue of fact remains as to whether the underlying insurer's policy was properly exhausted, thus triggering CU's duty to defend Weyerhaeuser.
*120 Weyerhaeuser's cross-appeal raises two additional issues concerning the proration of costs in relation to CU's coverage at certain sites. CU concedesand we agreethat in light of our subsequent holding in Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 951 P.2d 250 (1998), a remand to the trial court is necessary to determine the correct amount of Weyerhaeuser's judgment for the sites where the jury prorated damages.
Accordingly, we affirm in part and reverse in part and remand to the trial court for proceedings consistent with this opinion.

FACTS
A. Background
Weyerhaeuser is the party responsible for cleaning up hazardous waste at approximately 130 sites nationwide under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675, Washington's Model Toxics Control Act (MTCA), RCW 70.105D, and a variety of other state laws. Weyerhaeuser Co. v. Aetna Cas. & Sur. Co. (Weyerhaeuser I), 123 Wash.2d 891, 893, 874 P.2d 142 (1994). CERCLA and the MTCA impose strict liability for environmental cleanup. Id. at 898, 874 P.2d 142. The MTCA imposes joint and several liability for all natural resource damage and remediation costs. RCW 70.105D.040(2). Liability under both CERCLA and the MTCA extends broadly to current owners and operators of a facility, persons who owned or operated a facility at the time hazardous substances were disposed or released, and any other person who caused the disposal or release of the hazardous substance at any facility. See 42 U.S.C. § 9607(a); RCW 70.105D.040(1).[1] Weyerhaeuser claims its past and future "worst case scenario" costs may be as high as in the hundreds of millions of dollars to clean up these sites. Br. of Resp't/Cross Appellant at 22 (citing Clerk's Papers (CP) at 13410-13).
In 1992 Weyerhaeuser filed a declaratory judgment action against 34 insurance companies seeking a declaration of coverage with regard to property damage at 42 allegedly polluted sites in a number of states. CP at 142-214. Of these 42 sites only 15 are located in Washington (CP at 207-08), but because Weyerhaeuser is incorporated and headquartered in Washington, the trial court applied Washington law to the entire proceeding. CP at 295. Discovery and trial were divided into three phases or groups of sites. CP 236-94.
Prior to trial the court granted the defendant insurers' motion for summary judgment with regard to 15 sites, finding no coverage where the government had not instituted legal action because there was no claim of liability by a third party. Weyerhaeuser I, 123 Wash.2d at 894, 874 P.2d 142. We reversed, holding
Comprehensive General Liability (CGL) insurance policies, which provide coverage for all sums which the insured shall be obligated to pay by reason of the liability imposed by law for damages on account of property damage, may provide coverage when an insured engages in the cleanup of pollution damages in cooperation with an environmental agency. Such policies can reasonably be read to provide coverage for actions taken to clean up pollution damages required under environmental statutes which impose strict liability for such cleanup.
Id. at 896-97, 874 P.2d 142.
Subsequent to this decision and prior to the Phase I trial, all but one of the 34 insurance company defendants settled with Weyerhaeuser.[2] CU was the sole insurer that did not settle.
B. Employers Surplus Lines Supplemental Policy
As is common for large companies, Weyerhaeuser purchased its insurance in layers. *121 See Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 793, 881 P.2d 1020 (1994). At trial Weyerhaeuser claimed coverage under a supplemental or excess policy (hereinafter "supplemental policy") issued by Employers' Surplus Lines Insurance Company, No. E 62079 (Pl.'s Trial Ex. 3). CU then appeared as successor to Employers' Surplus Lines Insurance Co. CP at 223. The policy declarations page provided the policy was effective March 1, 1970 to March 1, 1973; however, an endorsement (No. 2) extended coverage from January 1, 1970 to March 1, 1970 (referred to as the "stub policy" or the "stub period"). Pl.'s Trial Ex. 3. A subsequent endorsement (No. 6) terminated coverage one month early on January 31, 1973. Id. The Employers' Surplus Lines policy supplemented the underlying Fireman's Fund Insurance Company policy ("underlying policy") pursuant to the following provision:
2. MAINTENANCE OF UNDERLYING INSURANCE
This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Policies stated in Item 2 of the Declarations [the Fireman's Fund policy] prior to the happening of an occurrence for which claim is made hereunder.
Id. The supplemental policy specified limits of $1,500,000 in excess of the Fireman's Fund $500,000 primary policy limits (CP at 8940), although the parties disagree as to whether the aggregate limit in the supplemental policy applies to, or limits, property damage coverage.[3] CU claims the $1,500,000 aggregate limit applies to property damage. Weyerhaeuser claims it does not, and contends there is no aggregate limit on property damage.
C. Trial
The Phase I trial began in fall 1994, focusing on (1) the Mid State landfill near Cleveland, Wisconsin, and (2) Weyerhaeuser's wood-treating plant in DeQueen, Arkansas. CP at 592-93. After three weeks the jury found coverage for the Mid State site but no coverage for the DeQueen site. The Phase II trial began in spring 1996 and included seven Washington sites. The jury found coverage for five of the seven sites. CP at 7130-44. The Phase III trial on 10 remaining sites was avoided by CU's offer of judgment to Weyerhaeuser totaling $4,001,000 plus certain future costs. CP at 7168-72, 7415-18. Weyerhaeuser accepted the judgment offer, which was filed on May 30, 1997. CP at 7415-25.
On December 19, 1997 the trial court entered the judgment on jury verdicts and declaratory judgment against CU in the amount of $7,873,200. CP at 11085. A supplemental monetary judgment of $556,200 in attorneys' fees and costs was entered on January 23, 1998. CP at 11180.
CU appealed a number of trial court rulings to the Court of Appeals and Weyerhaeuser responded and cross-appealed. The Court of Appeals certified the following "issue of broad public import" to this court:
What is the extent and nature of insurance coverage for pollution damage, including any set off for settlements received from other insurers?
Order of Certification, No. 42024-1-I (Feb. 26, 1999). The Commissioner accepted certification. Ruling Accepting Certification, No. 67694-1 (Mar. 8, 1999).
We must consider and decide the following issues: (1) Does the supplemental policy create a property damage aggregate limit and, if not, is CU entitled to a $500,000 per incident setoff?; (2) To what extent is CU entitled to offset settlements received by Weyerhaeuser from other insurers?; (3) Is CU obligated to provide coverage for Weyerhaeuser's legal liability arising from actions taken during the policy period by entities other than Weyerhaeuser when such actions result in liability to Weyerhaeuser imposed by law?; (4) Did the trial court properly admit expert testimony on the issue of damages at the Mid State site?; (5) Is Weyerhaeuser entitled to prejudgment *122 interest and, if so, from what date and on what awards?; (6) What was CU's "duty to defend"?; and finally, (7) Did the trial court properly instruct the Phase II jury regarding the meaning of the term "accident" contained in the Fireman's Fund policy? We discuss each of these issues, and their pertinent facts, in turn.

ANALYSIS

I

Limits of CU's Liability for Property Damage
In June 1993 the trial court granted Weyerhaeuser's motion for partial summary judgment, denying CU's cross-motion for partial summary judgment, on the question of whether the supplemental policy contains an aggregate limit for property damage liability. The court found "no aggregate limit for property damage liability" exists. CP at 579. Arguing the supplemental policy aggregate limit provision is virtually identical to the underlying Fireman's Fund aggregate limit provision, CU moved for partial summary judgment, asking the court to declare the Fireman's Fund policy likewise did not contain a property damage aggregate limit. CP at 1879. The trial court denied this motion on September 29, 1994. CP at 2844. CU assigns error to both of these rulings, which are reviewed de novo. Mid Century Ins. Co. v. Henault, 128 Wash.2d 207, 212, 905 P.2d 379 (1995).[4]
A. Aggregate Limit on Property Damage Liability.
We first consider whether the supplemental policy contains a property damage aggregate of $1,500,000, limiting the insurer's total liability for property damage to this sum for the policy period.[5] The trial court held the policy language imposes no aggregate limit for property damage claims, only aggregate limits for products liability and personal injury claims. CP at 579-80. We agree.
The criteria for interpreting an insurance contract are well settled:
In Washington, insurance policies are construed as contracts. An insurance policy is construed as a whole, with the policy being given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. If the clause is ambiguous, however, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.

B & L Trucking & Constr. Co., 134 Wash.2d at 427-28, 951 P.2d 250 (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994)) (citations omitted).
The language particularly at issue in the supplemental policy follows in bold face:
II. LIMIT OF LIABILITY UNDERLYING LIMITS
It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:
$[500,000] ultimate net loss in respect of each occurrence, but
$[500,000] in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational *123 Disease sustained by any employees of the Assured.
and the Underwriters shall then be liable to pay only the excess thereof up to a further
$[1,500,000] ultimate net loss in all in respect of each occurrencesubject to a limit of
$[1,500,000] in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.
Pl.'s Trial Ex. 3 at WEY0-000551-52 (emphasis and italics added to language at issue.)[6]
Although both CU and Weyerhaeuser argue this language contains no ambiguity, both attribute opposite meanings to the aggregate clause. The trial court also found no ambiguity, agreeing with Weyerhaeuser's interpretation that the clause set an aggregate limit for products liability and personal injury but not for property damage or anything else.
I find in favor of the plaintiff because I find that there is no ambiguity in this policy. I cannot find a general aggregate limit, and I cannot find a specific property aggregate. In order to find those things, I have to rearrange the punctuation in the policy.
RP at 33-34. A "fair, reasonable, and sensible" construction of the clause at issue supports the trial court's conclusion that the clause imposes an aggregate limit for products liability and personal injury claims but calls out no general aggregate limit for other types of claims, including property damage.
The policy provides excess liability up to $1,500,000 for each occurrence, subject to a limit of $1,500,000 "in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured." Pl.'s Trial Ex. 3 at WEY0 XXXXXX-XX (emphasis added). CU strains to show that this sentence structure creates three aggregate limits: (1) a general aggregate limit for all claimsincluding property damageother than products liability and personal injury; (2) an aggregate limit for products liability claims; and (3) an aggregate limit for personal injury claims. It argues its total exposure is therefore limited to $4,500,000a dollar sum nowhere expressly reflected in the policy language. Weyerhaeuser Co. v. Commercial Union Ins. Co., No. 67694-1 (oral argument (cassette tape) June 8, 1999).
Contrary to CU's assertion, we agree with the trial court that there is no ambiguity in this policy and that if CU had intended to place an aggregate limit on property damage it would have said so. Notwithstanding, CU's liability is still limited by applicable policy provisions to $1,500,000 net loss in all respects for each occurrence. If there are multiple occurrences within an annual period the plain language of this policy does not limit the insured's aggregate recovery for property damage or other types of loss aside from products liability and personal injury.
B. $500,000 Per Incident Setoff.
CU next argues if the supplemental policy's aggregate clause does not impose an aggregate limit on property damage coverage, "the same interpretation must be applied to the same language used to describe the aggregate limits of the underlying policy [Weyerhaeuser] promised to maintain." Revised Br. of Appellant at 34. We agree.
Weyerhaeuser's underlying insurance policy with Fireman's Fund contains the following clause:
(3) As respects Coverage B [property damage] subject to the above limit for any one occurrence or accident, the aggregate limit of the Company's liability for all damages shall be $500,000. as a result of all occurrences or accidents happening during the policy period.... *124 Def.'s Trial Ex. 2592, at WEY4 418683. Although the parties do not dispute this clause clearly establishes a property damage aggregate limit, this clause appears in the underlying policy, not CU's supplemental policy. CU therefore asks this court to examine language from its insurance policy to determine its right to offset the threshold exclusion for which Weyerhaeuser agreed to provide underlying insurance coverage whether or not it successfully obtained that coverage.
CU notes the language used in its supplemental policy's underlying aggregate exclusion clause is virtually identical to that used in the same policy's supplemental aggregate clause which we construed in the previous section not to impose an aggregate limit on property damage claims. CU contends if it has no aggregate limit for property damage, the insuredby virtue of the same languagemust be responsible for the first $500,000 of each property damage claim also without aggregate limit. The supplemental policy language here at issue provides:
It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:
$[500,000] ultimate net loss in respect of each occurrence, but
[$500,000] in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured
. . . .
Pl.'s Trial Ex. 3 at WEY0 XXXXXX-XX (emphasis added to language at issue). CU argues the underlying aggregate exclusion clause should be given the same meaning as the supplemental aggregate limitation clause, thus entitling it to offset $500,000 against each property damage claim notwithstanding the fact Weyerhaeuser's underlying policy does in fact impose a $500,000 aggregate limit on coverage to benefit its insured.
When interpreting a contract our primary goal is to discern the intent of the parties, and such intent must be discovered from viewing the contract as a whole. Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wash.2d 656, 674, 911 P.2d 1301 (1996). Our rules require interpreting the whole contract by giving it a "`fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" B & L Trucking & Constr. Co., 134 Wash.2d at 427, 951 P.2d 250 (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994)).
A fair, reasonable, and sensible construction compels us to agree that nearly identical language in these two clauses of the same policy must have the same meaning. See Holter v. Nat'l Union Fire Ins. Co., 1 Wash. App. 46, 50, 459 P.2d 61 (1969) ("In the absence of anything in the context of a contract clearly indicating a contrary intent, when the same word is used in different parts of the contract, it will be presumed to be used in the same sense throughout the contract.").
Because the CU aggregate limits clause cannot be read to provide an aggregate property damage limit on CU's liability, the exclusion clause similarly limits CU's liability to that in excess of $500,000 per incident, no matter how many incidents. Pl.'s Trial Ex. 3 at WEY0 XXXXXX-XX. See MacKenzie v. Empire Ins. Cos., 113 Wash.2d 754, 759, 782 P.2d 1063 (1989) (catastrophe policies provide coverage excess to that provided by the primary policy); Millers Cas. Ins. Co. v. Briggs, 100 Wash.2d 9,13, 665 P.2d 887 (1983) (liability of excess insurer does not arise until after the limits of the coverage under the primary policy have been exceeded); Mitchell L. Lathrop, Insurance Coverage for Environmental Claims § 8.03[3], at 8-39 (1992) (excess insurer's "obligation to defend and indemnify the insured upon exhaustion of the primary insurance is commanded by the terms of the excess policy itself."); Thomas V. Harris, Washington Insurance Law § 31.3, at 31-2 (1995) (describing "Umbrella and Excess [Insurance] Policies").
*125 Weyerhaeuser improperly focuses on CU's admission that the underlying Fireman's Fund policy contains a property damage aggregate by mistakenly overlooking the crucial fact that it is bound by its contract with CU and, by the terms of that contract, CU's liability arises only for sums in excess of $500,000 per incident without aggregate limit.[7]
Accordingly, we reverse the trial court, holding CU is entitled to a $500,000 per incident setoff with no aggregate limit on the number of setoffs for property damage.

II

Settlement Setoffs
Following the Phase II trial, CU moved to set off settlement funds received by Weyerhaeuser from other insurance carriers against the Phase I and Phase II jury verdicts. CU attempted to show the settlement funds received by Weyerhaeuser were sufficient to pay all proven and covered damages at the Phase I, II, III and other released sites, plus collateral claims for attorneys' fees and statutory interest, with over $5,000,000 remaining. The trial court denied CU's motion (CP at 11128-29)[8] and orally ruled:
THE COURT: Based upon the materials that I have reviewed and upon the oral argument presented, I am prepared to rule in the following way: I am denying CU's motion. The reason I am denying CU's motion is that I believe that they have not met the requirements of the Pederson Farms [sic] [Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co., 83 Wash.App. 432, 922 P.2d 126 (1996)] case; that in order to meet the requirements of Pederson Farms in a civil standard, they have to show by a preponderance of the evidence that there has been double recovery here.
Given the facts that we have before us, the form that the releases come in, the multiplicity of the claims and the parties, it is impossible to be able to sort that out at this point and for the court to say affirmatively that Commercial Union has demonstrated that Weyerhaeuser has been made whole.
RP at 4611.
In support of its claimed entitlement to offset other settlement funds received by Weyerhaeuser, CU argues, "A fundamental rule of damages prohibits multiple recovery." Revised Br. of Appellant at 36 (citing Monjay v. Evergreen Sch. Dist. No. 114, 13 Wash.App. 654, 658, 537 P.2d 825 (1975)). Weyerhaeuser demurs: "All parties agree that `double recovery' should not be permitted." Br. of Resp't/Cross-Appellant at 28. But even assuming the existence of a general rule barring double recovery absent policy language to that effect, the insured must first be fully compensated for its loss before any setoff is ever allowed. See Thiringer v. Am. Motors Ins. Co., 91 Wash.2d 215, 219-20, 588 P.2d 191 (1978).
CU relies upon contractual language that requires it "`to indemnify the Assured for all sums which the insured shall be obligated to pay.'" Revised Br. of Appellant at 36 (quoting Pl.'s Trial Ex. 3 at WEY0 000551) (italics added).[9] Indemnification, according *126 to CU, means to make whole; it does not mean an insured is entitled to double recovery. See also Securities Serv., Inc. v. Transamerica Title Ins. Co., 20 Wash.App. 664, 669, 583 P.2d 1217 (1978) (to indemnify is to reimburse for any loss). Even accepting CU's legal argument, we must first decide which party carries the burden of proving a double recovery where an insured has received general releases from other insurers. Amicus Lloyd's of London asks this court to reject the Court of Appeals decision in Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co., 83 Wash.App. 432, 451-52, 922 P.2d 126 (1996), which places the burden upon the insurance company seeking the setoff to prove a double recovery.
In Pederson's the court was faced with a substantially similar, albeit less complex, situation. The insured, Pederson's, sought to recover expenses incurred in cleaning up contamination from an underground gas tank. Pederson's Fryer Farms, 83 Wash. App. at 435, 922 P.2d 126. Pederson's settled with two insurers for $32,000. Id. at 436, 922 P.2d 126. Pederson's then prevailed in a suit for cleanup costs from a third insurer, Transamerica. Id. Despite the principle of inappropriate "double recovery" and the policy's "other insurance" clause, the court held setoff was not allowed.
The settlement, however, was not mere payment for Pederson's cleanup costs; it was in exchange for a release of liability for all past, present and future environmental claims. Transamerica did not demonstrate what part, if any, of the settlement was attributable to cleanup costs. Thus, no showing of double recovery was made. The trial court acted appropriately by not reducing the award.
Id. at 452, 922 P.2d 126.
As Weyerhaeuser correctly notes, the insurers that chose to settle in this case received far more than a imple release of liability at specific sites. Rather these companies also purchased certainty by avoiding the risks of an adverse trial outcome-not to mention forgoing the expenses associated with a lengthy trial and appeal. As the insurers "paid Weyerhaeuser for a release from an unquantifiable basket of risks and considerations," Br. of Resp't/Cross-Appellant at 23, we cannot say the settlements simply constituted payment for Weyerhaeuser's cleanup costs. Further, the rule articulated by Pederson's is supported by "Washington's strong public policy of encouraging settlements." Seafirst Ctr. Ltd. P'ship v. Erickson, 127 Wash.2d 355, 366, 898 P.2d 299 (1995). Were we to hold the insured bears the burden of proving it has not received a double recovery, such a rule would encourage litigation and reward the nonsettling insurer for refusing to settle.
CU and amicus Lloyd's further argue whatever the efficacy of the Pederson's rule it cannot survive our more recent holding in B & L Trucking, which established joint and several liability for all insurers at risk during a time of ongoing damage, B & L Trucking & Constr. Co., 134 Wash.2d at 424, 951 P.2d 250, and ask us to apply tort principles and statutes governing contribution in tort cases to interpret an insurance contract. The only Washington case to have considered this issue has refused the invitation. Dash Point Vill. Assocs. v. Exxon Corp., 86 Wash.App. 596, 606-07, 937 P.2d 1148, 971 P.2d 57 (1997).
Further, CU ignores the language in its own supplemental policy, which is dispositive. CU benefits from two exclusionary clauses in its contract that serve to limit its liability below a threshold in the nature of a deductible. See supra note 9. But CU tactically opted against arguing these clauses and did not provide this court with a sufficient record *127 to review the applicability of the supplemental policy's "other insurance" clause. Id. In effect CU now seeks applicability of these exclusionary clauses under another name. The burden of showing entitlement to an exclusion of liability based upon the existence of other insurance is properly CU's. See Queen City Farms, Inc. v. Central National Ins. Co., 126 Wash.2d 50, 71, 882 P.2d 703 (1994) (noting insurer bears burden of proving applicability of exclusions from coverage); see also Kenneth S. Abraham, Environmental Liability Insurance Law 121 (1991) (where insurers are jointly and severally liable for environmental damages, "[o]ther [i]nsurance" clauses supply basis for apportionment).
Having properly determined CU bears the burden of establishing a double recovery, we now address CU's contention it carried its burden and proved the settlement funds obtained from other insurers fully compensated Weyerhaeuser. We conclude it did not and agree the trial court's finding that Weyerhaeuser has not been made whole is supported by substantial evidence. See Price v. Kitsap Transit, 125 Wash.2d 456, 464, 886 P.2d 556 (1994).[10]
Weyerhaeuser submitted evidence establishing its past costs alone greatly exceed the settlement funds received from other insurers. CP at 13411-13. CU failed to persuasively rebut these figures and, in fact, submitted the same evidence to the trial court. Although CU asserts it conclusively showed Weyerhaeuser had been made whole and, in fact, had $5,000,000 remaining, its citations to the record in support of this assertion are wholly inadequate. CU simply directs this court to its earlier trial memoranda and a 400 page declaration from counseldocuments consisting almost entirely of confidential settlement agreementswith no showing of how this evidence supports CU's allegations. Further, confidential settlement communications are inadmissible for purposes of establishing Weyerhaeuser's liabilities. See ER 408 (offers of compromise are inadmissible to prove the amount of a claim); see also 5A Karl B. Tegland, Washington Practice: Evidence Law and Practice § 408.1, at 48 (4th ed.1999) (offers of compromise are irrelevant "because an offer to settle may be motivated solely by a desire to buy peace....").
We affirm the trial court on this point and hold CU failed to carry its burden to demonstrate Weyerhaeuser has been fully compensated for its liabilities. Accordingly, we conclude the trial court properly denied CU's request to offset settlements received from other insurers.

III

Extent of Coverage
Of the six sites tried to a jury and found covered under the Phase I and II trials, two were landfills: Mid State, Wisconsin, and Pasco, Washington. The Pasco landfill began operating in 1956 as a dump, but it was converted to a sanitary landfill in 1971. CP at 7099. Mid State became an operational sanitary landfill in 1971. CP at 11942.
The supplemental policy was effective March 1, 1970 to March 1, 1973. Pl.'s Trial Ex. 3 at WEYO 000544. Two supplemental endorsements resulted in coverage commencing on January 1, 1970 and ending on January 31, 1973. Pl.'s Trial Ex. 3 at WEYO 000546 and WEYO 000549. Although both the Mid State and Pasco landfills were operational during the supplemental policy period, Weyerhaeuser did not ship waste to these sites until after the expiration of the supplemental policy. CP at 7099; 11942.[11]
In December 1993 CU moved for partial summary judgment dismissing the Mid State site on grounds that the supplemental policy did not provide coverage for contamination because Weyerhaeuser did not ship waste to the site until 1974. CP at XXXXX-XXX. Although the trial court deferred ruling on whether property damage in fact occurred at Mid State before the supplemental policy *128 expired, it ruled the policy covered property damage that occurred during the policy periodeven though damage was not attributable to Weyerhaeuser's waste. CP at 14164-65.
CU claims it is not obligated to provide coverage for Weyerhaeuser's legal liability that arose due to actions of entities other than Weyerhaeuser during the policy period and disputes the following awards (excluding interest):
(1) $1,500,000 judgment for damages at the Mid State site (CP at 11088); and
(2) $143,542 judgment for damages at the Pasco landfill (CP at 11093).
CU argues that before its obligation to provide coverage is triggered, any property damage that occurred during the policy period must arise out of Weyerhaeuser's business operations as opposed to damage "caused by a stranger to the policy." Revised Br. of Appellant at 48.
The supplemental policy provided the following under "Coverage":
Underwriters hereby agree ... to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability
(a) imposed upon the Assured by law, or
(b) assumed under contract or agreement by the Named Assured ... for damages, direct or consequential and expenses on account of:
. . . .
(c) Property Damage,
. . . .
caused by or arising out of each occurrence happening anywhere in the world, and arising out of the hazards covered by and as defined in the Underlying Policies....
Pl.'s Trial Ex. 3 at WEYO 000551. The underlying Fireman's Fund policy agreed
TO PAY on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract or agreement, because of injury to or destruction of corporeal property, including all loss resulting therefrom, arising out of the business operations of the insured.
Def.'s Trial Ex. 2592 at WEY4 418663 (Coverage B). The Fireman's Fund policy defined "Occurrence" as "an event or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period." Id. at WEY4 418690.
It is uncontroverted that pursuant to current federal and state environmental statutes, Weyerhaeuser, as a responsible party, is jointly and severally liable for the cleanup of all contamination at these sites, including contamination caused by parties other than Weyerhaeuser at a time when Weyerhaeuser had no connection to or involvement with the property. See 42 U.S.C. § 9607(a); RCW 70.105D.040(1). Also Weyerhaeuser's liability arose out of its business operations, as it is undisputed Weyerhaeuser disposed waste at these sites. Further the actions that gave rise to Weyerhaeuser's legal liability occurred during the policy period. What did not occur was damage directly caused by Weyerhaeuser during the covered period. We must, therefore, address the issue of whether a comprehensive, general liability insurance policy covers property damage arising from the conduct of a third party at a time when the insured had no relation to or connection with the property.
Two federal district courts applying Washington law have ordered coverage under nearly identical circumstances and policies. One court reasoned:
Boeing's liability in the underlying litigation, relating to 1961-64, clearly arose out of its "operations," i.e., its post 1964 depositing of toxic wastes at the site. The phrase "all sums" is limited by the policy definitions of "occurrence" or "accident," but is not limited by any requirement that the insured's act be a proximate cause of the damages it is "legally obligated to pay." In Washington, if there is any ambiguity, policy language should be interpreted to promote coverage.
Boeing Co. v. Aetna Cas. & Sur. Co., "Order on Plaintiff's Motions for Partial Summary Judgment Regarding Extent of Duty to Defend *129 and Coverage for Policy Years 1961-1964 at Western Processing," 1991 WL 575712 (W.D.Wash., Oct.16, 1991) (No. C86-352WD) (citation omitted) (not reported in F.Supp.) (CP at 641). Accord, Puget Sound Power & Light v. Aetna Cas. & Surety Co., Order (May 19, 1998) (No. C95-1376C) (not reported in F.Supp.). Although these decisions are unpublished, we find their reasoning compelling.
Here the plain language of the policy requires coverage as the definition of "occurrence" is not limited to actions taken by Weyerhaeuser but includes any event which unexpectedly causes injury during the policy period. Def.'s Trial Ex. 2592 at WEY4 418690. And the nature of the liability imposed by the federal and state statutes compels coverage where the insurer has agreed to pay "all sums which the insured shall become obligated to pay as damages by reason of the liability imposed upon the insured by law...." Id. at WEY4 418663. Because the property damage occurred during the policy period and Weyerhaeuser has become obligated by reason of law, the plain language of the contract requires coverage.
CU argues that imposing liability upon the insurer of one company for the harms caused by another violates the basic rules of construction of an insurance contract. That is, imposing liability outside of the contract period is not a "`fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" B & L Trucking & Constr. Co., 134 Wash.2d at 427-28, 951 P.2d 250 (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994)). But the broad nature of the coverage Weyerhaeuser purchased defeats this argument.[12] If there is unfairness it is the statute which creates the liability, not the insured which attempts to insure against it. The policy required payment of "all sums which the Assured shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law...." Pl.'s Trial Ex. 3 at WEYO 000551 (improved resolution). The triggering event is an "occurrence," which is not limited to an act by Weyerhaeuser. Def.'s Trial Ex. 2592 at WEY4 418690. Although the parties may not have predicted liability of this nature would be imposed, it is nevertheless a legal liability imposed upon Weyerhaeuser by an occurrence as defined in Weyerhaeuser's insurance policy. Weyerhaeuser contractedand paid higher premiumsfor comprehensive coverage encompassing just such a situation.
CU also argues that liability did not arise out of property damage that occurred during the policy period, as Weyerhaeuser's liability for its shipments arose after the expiration of the supplemental policy. In support CU notes the California Court of Appeals, Sixth District, has held coverage exists only where the insured is liable for the damage at the time it occurred. FMC Corp. v. Plaisted & Cos., 61 Cal.App.4th 1132, 1154-55, 72 Cal. Rptr.2d 467, 480 (1998); A.C. Label Co. v. Transamerica Ins. Co., 48 Cal.App.4th 1188, 1192-93, 56 Cal.Rptr.2d 207, 209 (1996). However, the Court of Appeals, Fifth District, reached the opposite conclusion. Garriott Crop Dusting Co. v. Superior Court, 221 Cal.App.3d 783, 791-92, 270 Cal.Rptr. 678, 682-83 (1990).
During the pendency of this litigation the United States Court of Appeals for the Ninth Circuit resolved the apparent conflict favorably to the position here advocated by Weyerhaeuser. That court characterized the *130 question almost identically to the one presented here:
"Where the state seeks recovery for damage to state-owned groundwater contained within certain property, does the property owner's comprehensive general liability policy provide coverage if the damage occurred within the policy period, but the insured purchased the property after the policy period ...?"

In re K F Dairies, Inc. & Affiliates, 224 F.3d 922, 924 (9th Cir.2000) (quoting K F Dairies, Inc. v. Fireman's Fund Ins. Co., 179 F.3d 1226, 1227 (9th Cir.1999)).
The Ninth Circuit answered affirmatively, holding: "[W]e reject the analysis of A.C. Label and FMC Corp., and hold that coverage is provided under a [comprehensive general liability] policy if the damage occurred within the policy period, but the insured purchased the property after the policy period." In re K F Dairies, Inc. & Affiliates, 224 F.3d at 925.
This holding of the Ninth Circuit is directly on point and persuasive. See King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wash.2d 161, 178, 979 P.2d 374 (1999) (citing Inland Empire Distrib. Sys., Inc. v. Utils. & Transp. Comm'n, 112 Wash.2d 278, 283, 770 P.2d 624 (1989)).
CU seeks further support for its position from Wellbrock v. Assurance Co. of Am., 90 Wash.App. 234, 951 P.2d 367, review denied, 136 Wash.2d 1005, 966 P.2d 902 (1998). There the court held that an "occurrence" for insurance coverage purposes is determined by reference to the time of injury, not the time of initial negligence or damage. Id. at 242, 951 P.2d 367. However here the property damage, for which Weyerhaeuser is jointly and severally liable, did occur during the policy period. See also Villella v. Pub. Employees Mut. Ins. Co., 106 Wash.2d 806, 811-12, 725 P.2d 957 (1986) (denying coverage because insured failed to show either that actual damage had occurred during the covered period or that a continuing process of damage had commenced during that period).
Support for CU's coverage obligation may be found in our holding in Weyerhaeuser I. There we pointed out that the nature of liability imposed under environmental cleanup acts requires coveragenotwithstanding the extent of the insured's faultas such statutes "impose liability, often without fault, on polluters in order to safeguard society in general." Weyerhaeuser I, 123 Wash.2d at 909, 874 P.2d 142. Recognizing CU's coverage obligation is consistent with the nature of the legal liability imposed by CERCLA and the MTCA: it is strict, joint and several, and retroactive. The legal responsibility to cleanup the property damage that occurred at the sites during the policy period is now Weyerhaeuser's.
The following excerpt is particularly applicable here:
We recognize and even sympathize with the dismay of insurers who issued "occurrence" (as opposed to "claims made") policies many years ago without advance knowledge that in 1980 Congress would enact CERCLA and impose retroactive liability upon insureds who had "disposed of hazardous waste in a completely legal, nonactionable manner". Boeing, 113 Wash.2d at 907, 784 P.2d 507 (Callow, C.J., dissenting). But our Supreme Court has rejected these same public policy arguments as we are now hearing, in Boeing. Our Supreme Court has declined to "rewrite the principles of insurance contract analysis in Washington, and then to retroactively apply these rewritten principles to the policyholders that bought their policies decades ago." Boeing, 113 Wash.2d at 887, 784 P.2d 507.
Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 64 Wash.App. 838, 888, 827 P.2d 1024 (1992), aff'd, 124 Wn.2d 536, 126 Wash.2d 50, 882 P.2d 703, 891 P.2d 718 (1994).
We hold the plain language of the contract, the comprehensive nature of the policy, and the nature of the liability imposed by CERCLA and the MTCA mandates coverage. The trial court properly denied CU's motion for summary judgment on this issue.

*131 IV

Expert TestimonyProperty Damage at Mid State
Kathryn Huibregtse was the principal engineer responsible for the remediation design at the Mid State landfill site. RP at 852. She is a professional engineer with a degree in chemical engineering who specializes in the evaluation of how chemical constituents are transported through the environment underground. RP at 833-41. The trial court allowed Huibregtse, over objection, to offer opinions regarding the transport and deposit of chemicals and the existence of groundwater contamination at Mid State. RP at 900-01.
Huibregtse's testimony involved six key subject areas: (1) the nature of the wastes placed into the site; (2) local rainfall data from 1971-72; (3) local and site-specific geology and hydrogeologies; (4) observation of on-site equipment operators; (5) documentation of site conditions by the Owen Ayres consulting firm; and (6) observation concerns of state officials regarding depth of bedrock and other operational issues. Pl.'s Trial Ex. 3679.
CU argues the trial court improperly admitted the expert testimony of Huibregtse. Specifically, CU alleges that because Weyerhaeuser "offered no proof of the factual assumptions underlying Huibregtse's opinion, her opinion was improperly admitted." Revised Br. of Appellant at 56.
The admissibility of expert testimony is governed by Evidence Rules (ER) 702 and 703.[13] The determination of the admissibility of expert testimony is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. See, e.g., State v. Stenson, 132 Wash.2d 668, 715, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). A court abuses its discretion when its decision is based on untenable grounds or is manifestly unreasonable or arbitrary. Testimony that will assist the trier of fact to understand the evidence or to determine a fact is to be admitted. ER 702.[14] However, it is an abuse of discretion for a court to admit expert testimony that lacks an adequate foundation. Walker v. State, 121 Wash.2d 214, 218, 848 P.2d 721 (1993).
CU challenges two aspects of Huibregtse's testimony and argues there was "no evidence" that (1) drainage trenches were dug to the level of bedrock, or (2) sufficient hazardous materials were deposited to cause subsequent contamination. But CU both misconstrues Huibregtse's testimony and ignores evidence that supports it. Huibregtse's testimony made clear when she was offering an opinion based upon evidence generally relied upon by experts in her field. RP at 876, 898-99. When an expert bases her opinion on evidence "of a type reasonably *132 relied upon by experts in the particular field," the underlying facts or data need not be admissible. ER 703. Further, Huibregtse's assumptions are supported by substantial evidence. See, e.g., Pl.'s Trial Ex. 1008 at 2 (noting size of service area); Pl.'s Trial Ex. 3679 at 2 (noting hazardous nature of household waste); id. at 7 (initial trenches dug to bedrock); id. at 3-4 (monthly rainfall at site from August 1971 to December 1972); id. at 4 (site began accepting waste in August 1971 and one trench was half full by October 1971).
In support of its argument, CU relies entirely on two cases wherein the appellate court affirmed a trial court's decision not to admit expert testimony (State v. McDonald, 98 Wash.2d 521, 529, 656 P.2d 1043 (1983) and State v. Pittman, 88 Wash.App. 188, 198, 943 P.2d 713 (1997)). CU's use of these cases ignores that we review the trial court's decision for abuse of discretion. As we explained in McDonald, the trial court did not abuse its "very wide discretion in deciding" to exclude the expert opinion evidence as the "testimony did not establish to the court's satisfaction" the first factual matter, nor did the offered testimony "satisfy the court" on the second issue. McDonald, 98 Wash.2d at 529, 656 P.2d 1043 (emphasis added).
The trial court did not abuse its discretion to admit the expert testimony of Ms. Huibregtse.

V

Prejudgment Interest
After the Phase I and II trials concluded, Weyerhaeuser moved for an award of prejudgment interest. The trial court's final judgment included three disputed awards of prejudgment interest: (1) for the Phase I and II trial sites where cleanup invoices existed and damages were arguably liquidated, interest was awarded from the date of the invoice through the date of the verdict; (2) for the Longview site where damages were unliquidated (CP at 10819-20), interest was awarded from the date of the verdict; and (3) for attorneys' fees awarded pursuant to Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991), interest was awarded from the date of the court order awarding attorneys' fees. CP at 11125-27A.
A. Interest from Date of Invoices
Weyerhaeuser's entitlement to prejudgment interest is controlled by our decision in Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 442 P.2d 621 (1968). There we held in Washington a party is entitled to prejudgment interest where the amount due is "liquidated," id. at 32, 442 P.2d 621, and defined a "liquidated" claim as one where the evidence furnishes data which, if believed, make it possible to compute the amount due with exactness, without reliance on opinion or discretion. Id.

It would seem that the existence of a dispute over the whole or part of the claim should not change the character of the claim from one for a liquidated, to one for an unliquidated, sum, and this conclusion finds support in the cases..... [T]he sum is still "liquidated" according to what is believed to be the better view, although the sum is not fixed by agreement and although the facts upon which the claim is based may be disputed, and even though the adversary successfully challenges the amount and succeeds in reducing it.

Under this view, only those claims would be termed "unliquidated" where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed. If this be so, a claim, for the full amount of a note for $1,000 is "liquidated" though the defendant claims, and the evidence is in dispute on such defense, that he has paid half this sum. So also a claim for $1,000 alleged to have been in small amounts at different times embezzled by a bank cashier should be considered "liquidated," though the fact and amount of each separate taking is disputed. In short, it is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a "liquidated sum." *133 Id. at 33, 442 P.2d 621 (quoting Charles T. McCormick, Handbook on the Law of Damages § 54, at 215-16 (1935)) (underline added).
Weyerhaeuser persuasively argues its claims fit within the Prier framework. Here, the parties disputed the amount of insurance coverage available and the amount of damage sustained. Once liability was established, however, calculating the amount due required no discretionit equaled the invoices for the cleanup work performed. The questions before the jury were simply ones of liability and did not involve opinion or an exercise of discretion regarding the amount of the award, as would be the case with general damages. Weyerhaeuser factually established its costs through the presentation of invoices. The date those invoices were paid established the proper time interest began to run.
CU seeks to distinguish Prier, contending that the complexities of this case and the nature of its defense defeat its application, but we find this argument unpersuasive. Our rule in Prier is clearly applicable where, as here, the damage amount was established or could be ascertained with certainty based upon the facts before the court.
We affirm the trial court's award of prejudgment interest for the five sites with invoices for cleanup costs.
B. Longview Site Interest
The trial court awarded interest from the verdict date through the judgment date for the Longview site. Weyerhaeuser concedes damages were unliquidated as "establishing Weyerhaeuser's Longview damages required testimony allocating certain vendor bills between environmental remediation (for which coverage existed) and capital improvements (for which it did not) (RP at 1816-25)." Br. of Resp't/Cross-Appellant at 58; see also CP at 11126, ¶ 1(b). As such, this award of prejudgment interest was error.
By statute, interest is awarded from the date of entry of judgment. RCW 4.56.110(3). We have explicitly rejected the contention that interest should run from the date of entry of verdict. Kiessling v. NW Greyhound Lines, 38 Wash.2d 289, 297-98, 229 P.2d 335 (1951). Weyerhaeuser cites no contrary authority and admits Kiessling is against it.
Weyerhaeuser does not ask us to overrule Kiessling and effectively ignore RCW 4.56.110(3); thus, we follow precedent. Interest for the nonliquidated damages for the Longview site runs only from date of judgment. We reverse the trial court's ruling to the contrary.
C. Prejudgment Interest on Attorneys' Fees
The trial court awarded prejudgment interest on Weyerhaeuser's Olympic Steamship[15] attorneys' fees. Weyerhaeuser does not argue that attorneys' fees are liquidated and thus properly the subject of prejudgment interest. Instead, it relies upon the "spirit" of Olympic Steamship and notes fees are awarded to allow the insured "`to obtain the full benefit of his insurance contract....'" Br. of Resp't/Cross-Appellant at 60 (quoting Olympic S.S. Co., 117 Wash.2d at 53, 811 P.2d 673). Notwithstanding, an award of attorneys' fees is precisely the type of discretionary claim where we have rejected the right to prejudgment interest. Prier, 74 Wash.2d at 32-33, 442 P.2d 621. In fact, Weyerhaeuser cites no authority permitting an award of prejudgment interest for fees.
The majority of courts that have considered this issue have concluded prejudgment interest on attorneys' fees is improper. See Bocek Bros. v. Anchorage, 750 P.2d 335, 338 (Alaska 1988); Harvey v. Gerber, 153 Mich. App. 528, 396 N.W.2d 470, 471 (1986) (per curiam); Maynard v. Mine Hill Township, 244 N.J.Super. 298, 303, 582 A.2d 315, 318 (1990); Canyon Country Store v. Bracey, 781 P.2d 414, 422 (Utah 1989). Florida, however, allows interest to be calculated from the date a decision is made to award attorneys' fees, *134 even though the amount is not yet determined, until the date the fees are paid. Quality Engineered Installation, Inc. v. Higley S., Inc., 670 So.2d 929, 931 (Fla.1996). The court based its decision on the same equitable principles argued by Weyerhaeuser. Id. Perhaps delay in the award of fees might be considered with respect to whether current or historical rates apply, see, e.g., Missouri v. Jenkins, 491 U.S. 274, 283-84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), but prejudgment interest is not available.
Although Weyerhaeuser's arguments are resounding in their equity, they are nevertheless best categorized as matters of "sound public policy." Br. of Resp't/Cross-Appellant at 60-62. As such, this court is not the proper forum to establish a right to such an award. See Burkhart v. Harrod, 110 Wash.2d 381, 385, 755 P.2d 759 (1988) (public policy is matter usually left to the legislature and not the courts). Accordingly, we reverse the trial court's award of prejudgment interest for Weyerhaeuser's attorneys' fees.

VI

Duty to DefendStringfellow
Shortly before filing this suit, Weyerhaeuser notified CU of 95 sites for which it was seeking coverage. The Stringfellow site included civil claims by local residents as well as the cleanup action brought by the Environmental Protection Agency and the State of California. CP at 4497-501.
Six months after this suit was filed, Weyerhaeuser settled its coverage disputes with the primary insurer, Fireman's Fund. Pursuant to this settlement, Fireman's Fund paid Weyerhaeuser an amount agreed to be the then-present value of the remaining policy limits for property damage claims under all the Fireman's Fund policies at issue. CP at 4452-81. This settlement did not include payment for Weyerhaeuser's environmental defense costs nor did it include payment for bodily injury claims. Id.
Pursuant to its policies, Fireman's Fund subsequently reimbursed Weyerhaeuser for some of its attorneys' fees incurred in defending the Stringfellow claims. CP at 4708-13. On November 26, 1993, Weyerhaeuser notified CU the settlement had exhausted the Fireman's Fund aggregate property damage limits and asked CU to assume the costs of defending the environmental claims, including those at Stringfellow. CU refused to pay these costs.
At trial, Weyerhaeuser moved for partial summary judgment requesting CU be required to pay Weyerhaeuser's reasonable defense costs at Stringfellow. CP at 4316. The trial court granted the motion and ordered CU to pay these costs as the underlying policy "has been tendered, that it is exhausted, and the duty to defend becomes the excess carrier's responsibility on the date of notification." CP at 4747. The trial court subsequently awarded Weyerhaeuser Olympic Steamship attorneys' fees incurred in establishing CU's defense obligation. CP at 11057-59; 10459-60; 11095 ¶ 18.
Although CU does not deny its duty to defend, it contends its duty had not been triggered because Fireman's Fund's obligation to defend was still in force.[16] "[A] primary insurer's duty to defend continues until the suit it is defending is resolved by settlement or judgment, and ... the primary insurer may not relieve itself of its defense obligation by tendering its policy limits prematurely." Reply/Resp. Br. of Appellant/Cross-Resp't at 34.
The duty to defend and the duty to indemnify are distinct obligations, Weyerhaeuser I, 123 Wash.2d at 902, 874 P.2d 142, the former being broader. Viking Ins. Co. v. Hill, 57 Wash.App. 341, 346, 787 P.2d 1385 (1990). An excess insurer's obligation to defend is generally defined by the excess policy. Lathrop Insurance Coverage § 8.03[3] at 8-39. Here, the supplemental policy is silent regarding CU's duty to defend. But an excess insurer's duty to defend may also arise when: (1) the claim is covered under the language of the excess policy; (2) the excess policy does not expressly eliminate *135 any defense obligation; and (3) the coverage and obligations of the underlying insurers have been validly exhausted. Id., § 8.03[1][c], at 8-33; Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 56 Cal.App.3d 791, 800, 129 Cal.Rptr. 47, 53 (1976). If an excess insurer were required to defend before exhaustion of an underlying carrier's duty, then the "primary carrier would profit from its wrongful failure to defend." Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co., 76 Wash. App. 527, 531, 887 P.2d 455 (1995).
In this case, the underlying policy required Fireman's Fund to "defend in the name and on behalf of the insured any such suit or other proceeding in the event no settlement thereof is made...." Def.'s Trial Ex. 2592 at WEY4 XXXXXX-XX. But the policy also required Fireman's Fund to go beyond its limit of liability, if necessary, to pay defense costs prior to settlement. Id. at WEY4 418668(1)(c).
The majority of jurisdictions adhere to the following rule: once the underlying insurer has paid its limits in settlements or judgments, the supplemental insurer's obligation to defend arises. Perez Trucking, Inc. v. Ryder Truck Rental, Inc., 76 Wash. App. 223, 233-34, 886 P.2d 196 (1994); Zurich Ins. Co. v. Raymark Indus., Inc., 118 Ill.2d 23, 53, 112 Ill.Dec. 684, 514 N.E.2d 150, 163 (1987); Colorado Farm Bureau Mut. Ins. Co. v. N. Am. Reinsurance Corp., 802 P.2d 1196, 1198 (Colo.Ct.App.1990). However, a mere tendering of policy limits does not abrogate an underlying insurer's duty to defend. Perez Trucking, Inc., 76 Wash.App. at 233-34, 886 P.2d 196.
Although the trial court order provides the Fireman's Fund policy had been exhausted, it does not state how this exhaustion occurred. CP at 4747. Weyerhaeuser contends the policy was exhausted by consent decrees entered into at the Stringfellow site. However, with the exception of one sample decree, which does not show a dollar amount (CP at 4676-77), and Weyerhaeuser's offer to submit more detailed information (CP at 4663 n. 4), there is no complete accounting of the costs of these consent decrees. CU does not dispute the existence of these decrees, but questions whether they constitute "settlements" for the purpose of exhausting the underlying policy.
When determining issues of coverage, the relationship of an administrative action to a lawsuit is a major concern. See Abraham, supra at 264-66 (noting advantages and disadvantages of equating an administrative action to a lawsuit for purposes of compelling coverage). However, Washington resolved this issue in Weyerhaeuser I where we held the insurers were obligated to pay for the hazardous waste cleanup costs imposed by law, even if a lawsuit had not been filed. When an insured "engages in the cleanup of pollution damages in cooperation with an environmental agency," coverage exists. Weyerhaeuser I, 123 Wash.2d at 896-97, 874 P.2d 142. Thus Fireman's Fund had an obligation to pay for cleanup costs imposed via consent decrees, and the exhaustion of its policy through such cleanup costs is the equivalent of exhaustion by settlement. If this occurred, Fireman's Fund's legal obligation to defend was similarly exhausted, thus triggering CU's obligation to pay the defense costs at Stringfellow.
Still, the question remains whether these consent decrees and other covered obligations exhausted the Fireman's Fund policy. Weyerhaeuser is entitled to prevail on summary judgment only if there is no genuine issue as to any material fact. CR 56(c). The total coverage amount of the underlying Fireman's Fund policy is $3,000,000. CP at 13888. The estimated costs for Stringfellow alone were more than this amount and the actual costs far exceeded this amount. CP at 9004. However, construing all the facts in the light most favorable to CU, we conclude CU demonstrates a genuine question of material fact exists as to whether Fireman's Fund's settlement with Weyerhaeuser was a premature tender and thus did not discharge Fireman's Fund's duty to defend.[17]
*136 We hold the payment of funds for costs of complying with a consent decree is the functional equivalent of a settlement, and the underlying insurer's duty to defend ceases once its policy has been exhausted by payments made for this purpose. When an underlying insurer's policy is exhausted in this manner, the supplemental insurer's duty to defend is triggered. However, because a question of material fact remains as to whether the Fireman's Fund policy was properly exhausted, we reverse the trial court's order granting Weyerhaeuser partial summary judgment and remand for further proceedings. We also reverse the trial court's award of Olympic Steamship attorneys' fees to Weyerhaeuser on this issue pending remand.

VII

Jury Instruction"Accident"
In the event of a remand, Weyerhaeuser argues that jury instruction No. 15 given in the Phase II trial (CP at 7122) was erroneous and must be reformulated.
Weyerhaeuser offers no argument, citation, or direction on this issue, but instead refers us to its argument to the trial court. Id. at 82. A party may not fail to argue an assigned error by mere citation to trial memorandum.
Only issues raised in the assignments of error ... and argued to the appellate court are considered on appeal.
If this court allowed parties to expand the issues subject to appeal by reference to trial memoranda, the Rules of Appellate Procedure would be rendered meaningless.
State v. Kalakosky, 121 Wash.2d 525, 540 n. 18, 852 P.2d 1064 (1993) (emphasis added) (citations omitted); see also RAP 10.3(a)(5) (appellant's brief must provide argument and citations); RAP 12.1(a) (appellate court will decide case only on the basis of issues set forth in briefs). Accordingly, we decline to review this issue.

VIII

Appellate Attorneys' Fees
Pursuant to RAP 18.1, Weyerhaeuser seeks attorneys' fees on appeal. As Weyerhaeuser has prevailed on a number of coverage-related issues, an award of such fees is proper. See Olympic S.S. Co., 117 Wash.2d at 53, 811 P.2d 673.

CONCLUSION
We conclude the trial court properly held the supplemental policy does not create a general property damage aggregate limit but we hold CU is entitled to a $500,000 per incident setoff against the underlying policy without aggregate limit and therefore reverse the trial court's ruling to the contrary. We affirm the trial court's ruling that CU was not entitled to set off the settlements Weyerhaeuser received from other insurers. We also affirm the trial court's holding that CU was obligated to provide coverage for the Mid State and Pasco sites and uphold the admission of Ms. Huibregtse's expert testimony.
We affirm the trial court's award of prejudgment interest for the five sites where damages were liquidated, but we reverse the award of prejudgment interest for the site where damages were not liquidated and we reverse the award of prejudgment interest on awarded attorneys' fees.
Although we hold the costs of complying with consent decrees is the functional equivalent of a settlement and the exhaustion of the underlying insurer's policy through such payment triggers the supplemental insurer's duty to defend, we conclude an issue of material fact remains as to whether the Fireman's Fund policy was exhausted prior to the trial court's grant of partial summary judgment. Accordingly, we reverse both the order granting partial summary judgment and the award of attorneys' fees to Weyerhaeuser for securing that order and remand this issue to the trial court for further proceedings.
Finally, we remand for recalculation of damages for the sites where damages were prorated to bring these amounts in line with *137 our holding in B & L Trucking. Because Weyerhaeuser prevailed on a number coverage-related issues, we award reasonable attorneys' fees to Weyerhaeuser.
GUY, C.J., SMITH, ALEXANDER, and IRELAND, JJ., concur.
MADSEN, J. (dissenting).
The majority improperly concludes that Commercial Union's excess liability insurance policy covers Comprehensive Environmental Response, Compensation, and Liability act (CERCLA) liability resulting from pollution occurring before Weyerhaeuser disposed of any waste at the Mid State and Pasco landfills. Neither the policy language nor our rules for construing insurance contracts supports the majority's result. Accordingly, I must dissent on this issue. I also have signed Justice Talmadge's dissenting opinion which correctly concludes that Commercial Union's excess liability insurance policy contained an annual aggregate $1.5 million coverage limit for property damage and the Fireman's Fund policy had a $500,000 aggregate annual property damage limit of liability.
Weyerhaeuser shipped waste to the Pasco site between July 1973 and November 1974, and to the Mid State site beginning in early 1974. The Commercial Union policy expired before these shipments occurred. The majority holds that the insurer is nevertheless required to indemnify for CERCLA clean up costs associated with damages occurring before Weyerhaeuser had any connection with the damaged property.
While Weyerhaeuser is jointly and severably liable for clean up costs under CERCLA as a result of its shipments of wastes, statutorily imposed liability does not necessarily equate to insurance coverage. Coverage must be determined by examining each relevant term of the excess and primary policies. Unfortunately, the majority misreads the policy language in this case and relies upon unpublished and unpersuasive court orders.
Construction of the terms of an insurance policy is a question of law for the court. Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 575, 964 P.2d 1173 (1998); Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wash.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994). Insurance policies are contracts, and the goal of the court is to determine the intent of the contracting parties. Eurick v. PEMCO Ins. Co., 108 Wash.2d 338, 340-41, 738 P.2d 251 (1987). Plain language susceptible to only one reasonable interpretation should be given effect to carry out the contracting parties' intent, and thus the court's initial undertaking is to examine the terms of the insurance contract to determine whether under its plain meaning there is coverage. See Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173. Also, the policy should be given a fair, reasonable, and sensible construction such as the average purchaser of insurance would give it. Kitsap County, 136 Wash.2d at 575, 964 P.2d 1173; Queen City Farms, 126 Wash.2d at 65, 882 P.2d 703. The insurance contract must be viewed in its entirety. Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997).
The Commercial Union excess policy provided that the insurer would indemnify Weyerhaeuser for "all sums" which Weyerhaeuser was obligated to pay by reason of liability imposed by law caused by or arising out of an "occurrence." Clerk's Papers (CP) at 13975. "Occurrence" was defined in the Fireman's Fund policy, the underlying primary policy, as "an event or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period." CP at 13980. The primary policy also provided that the insurer would pay
all sums which the insured shall become obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract or agreement, because of injury to or destruction of corporeal property, including all loss resulting therefrom, arising out of the business operations of the insured.
CP at 13979 (emphasis added).
The majority reads this latter provision to require coverage where the liability arises out of the business operations of the insured, and reasons that Weyerhaeuser's liability arises out of the business operations of the *138 insured because the joint and several strict liability of Weyerhaeuser under CERCLA results from its shipment of wastes to the two sites.
I believe the majority misreads and misapplies the policy language. The provision states that the insurer will pay "all sums" which Weyerhaeuser has "to pay as damages by reason of the liability imposed upon" Weyerhaeuser by CERCLA "because of injury to or destruction of corporeal property... arising out of the business operations of the insured." CP at 13979. In my view, the policy thus states that the injury to the property, which gives rise to the liability, must arise out of the business operations of the insured. Thus, reading the coverage provisions as a whole, for coverage to exist under the policies, liability imposed by law must be caused by or arise out of an occurrence, which, given the definition of "occurrence," requires that injury to property during the policy period must occur. Further, coverage exists only where the property damage arises out of the business operations of the insured. Because Weyerhaeuser's shipments of waste did not occur until after the policy period expired, no injury to property arose out of its business operations during that period and there is accordingly no coverage under the language of the policy.[1]
Not only is this construction in accord with the language used in the policies, it achieves the important goal of giving the contract a fair, reasonable, and sensible construction. In similar circumstances, where the insured claimed coverage for CERCLA clean up costs resulting from pollution under a policy antedating any involvement by the insured with the damage sites, a California court declined to find coverage, reasoning that a complete factual predicate for liability subsequently imposed by law must exist during the policy period. FMC Corp. v. Plaisted & Cos., 61 Cal.App.4th 1132, 1154, 72 Cal. Rptr.2d 467 (1998). In relevant part, FMC involved sites (called "A" sites by the court) where the insured had no involvement with the sites either directly or through a predecessor until after the policy period expired. The court reasoned:
[W]hile it is indeed appropriate to require that an insurer that writes, and accepts a substantial premium for, general liability insurance assume the risk of expansion in legal theories of liability applicable to facts which occurred in or before the policy period, it is neither reasonable nor consonant with the terms of the general liability policies before us to require such insurers to cover liabilities based on facts which did not occur until after the policy period. A general liability insurer can realistically be said to be in the business of understanding and taking into account the legislative and judicial dynamics that produce changes in legal theories, but cannot be required to be clairvoyant as to the infinite possible future permutations of facts, fundamental to the very existence of coverage but not in existence during the policy period, once the policy period has expired.
FMC Corp., 61 Cal.App.4th at 1154-55, 72 Cal.Rptr.2d 467.
The majority suggests, though, that California courts are split on this issue, citing Garriott Crop Dusting Co. v. Superior Court, 221 Cal.App.3d 783, 791-92, 270 Cal.Rptr. 678, 682-83 (1990) as reaching the opposite conclusion. Majority at 129. The majority is mistaken. On the question presented by *139 this case, there is no split of authority represented by FMC and Garriott.
In Garriott the insurer, United States Aviation Underwriters, Inc. (USAU), issued successive policies which covered property damage. The insured used its property as a disposal site, and the policy period of at least one of the policies coincided with the disposal of wastes. Eventually, the adjacent property owner, the City of Bakersfield, learned its property had been contaminated and brought suit against the insured. The city had acquired the adjacent property 15 years after the last USAU policy period expired. The insurance company covering the insured at the time of the suit filed a declaratory judgment action against numerous insurance companies, including USAU, alleging they had provided liability coverage during the relevant period. USAU filed a cross-complaint, arguing that no coverage existed because the claimant city was not damaged during the USAU policy periods.
The court examined the policies' language, noting that the policies provided that the event triggering coverage "is one that causes `physical injury to or destruction of tangible property' during the policy period[ ] [but, the court said, n]owhere do the policies say to whom that property must belong, save that it must not belong to the insured. In other words, the policies themselves do not expressly require that the eventual claimant own the property at the time the property is damaged for coverage to ensue...." Garriott, 221 Cal.App.3d at 791, 270 Cal.Rptr. 678. Accordingly, the issue was not when the city was damaged, but rather when the property owned by the city was damaged. Id.
Unlike Garriott, alleged CERCLA liability concerning the "A" sites in FMC Corp. did not involve a question of liability to a subsequent owner of property which was allegedly damaged prior to acquisition as a result of the acts of the insured during the policy period. Moreover, the issue in Garriott is not like the question before this court. Here, like the "A" sites in FMC, the question involves liability of the insured resulting from damage to property caused by third parties occurring before there was ever any connection with or involvement with the property by the insured. Garriott is clearly distinguishable.
The majority also states that during the pendency of this litigation the Ninth Circuit resolved the apparent "conflict" between Garriott and FMC in favor of coverage. Majority at 130. The majority states that the Ninth Circuit's holding in In re KF Dairies, Inc. & Affiliates, 224 F.3d 922 (9th Cir.2000) is "directly on point" and "persuasive." Id. I must disagree. Nowhere in the Ninth Circuit's opinion is there any discussion whatsoever of the policy language at issue in this case the obligation to pay "all sums" which Weyerhaeuser has "to pay as damages by reason of the liability imposed upon" Weyerhaeuser by CERCLA "because of injury to or destruction of corporeal property ... arising out of the business operations of the insured." CP at 13979. The majority's statement of a rule of law from In re KF Dairies is meaningless since the relevant policy language at issue here was not at issue there.
Insofar as In re KF Dairies disagrees with FMC, FMC is the better reasoned decision.
The parties here could, of course, have contracted for coverage under the circumstances presented. However, for the reasons offered by the court in FMC, absent language to that effect, it is neither sensible nor reasonable to read the policy provisions in this case to require coverage where the factual predicate for liability, Weyerhaeuser's shipment of wastes, did not occur until after the policy period expired.
The average commercial purchaser of insurance would read this policy language to mean that while statutorily imposed liability for damages might well be retroactively imposed and lead to coverage under the policy, it would be because of an occurrence involving the insured's business during the policy period, not because of factual events completely unrelated to the insured during the policy periods.
Other courts have similarly declined to find coverage under circumstances like those in this case. In Arco v. Travelers Ins. Co., 730 F.Supp. 59 (W.D.Mich.1989), the court examined *140 coverage issues under an occurrence-based policy. The insured had contracted with another company, Thermo Chem, to remove hazardous wastes from the insured's manufacturing plant to Thermo Chem's processing facility. The insured made two shipments of waste under this contract which led to its alleged liability under CERCLA for clean up of the Thermo Chem site. However, just as in the case before this court, the policy periods of the insurance policies at issue in Arco expired before the two shipments were made.[2] The court focused on the policy language, noting the definition of an "occurrence" as being "`an accident ... which results, during the policy period, in bodily injury or property damage[.]'" Arco, 730 F.Supp. at 63 (quoting policy). The court concluded that "[w]hether one defines an occurrence by the date of shipment, the date of damage to the environment, or the date the damage is discovered, it is obvious that an occurrence cannot happen before the earliest of these datesthe date [the insured] shipped its [wastes] to Thermo Chem." Id.
The court in Arco clearly required that the "occurrence" giving rise to liability, which had to cause injury during the policy period, be connected to the insured's act resulting in CERCLA liability. In the case before this court, the policy language, like that in Arco, requires that the injury to property occur during the policy period. As the court did in Arco, this court should find that because there is no event connected to Weyerhaeuser which constitutes an occurrence, there is no coverage.[3]
In Avondale Indus., Inc. v. Travelers Indem. Co., 774 F.Supp. 1416 (S.D.N.Y.1991), the insured also shipped wastes to a site after expiration of the policy periods. The court determined that the insurers had no duty to defend underlying actions arising out of the escape of pollution from the waste oil dump and reclamation facility because as a matter of law the insurers had no duty to indemnify under the policies. The court aptly explained that when the insured shipped the wastes was irrelevant to the statutory clean up and private actions, "both of which sound, entirely or in part, in strict liability and will likely focus on issues of causation and damages." Avondale, 774 F.Supp. at 1426. However, the timing of the shipments was relevant to the court's decision whether there was a duty to defend. The court concluded as a matter of law, in light of extensive discovery which had occurred, that the party demanding coverage would be unable to prove that any waste was shipped during the coverage periods of the policies at issue and therefore the insurers had no duty to indemnify, and accordingly no duty to defend. Id. at 1427.
The majority's reliance on two unpublished federal district court rulings as providing persuasive reasoning on this issue is misplaced. First, although the majority gives lip service to the principle that unpublished opinions are nonbinding and have no precedential value, it nevertheless says the two orders' reasoning is compelling. This circuitous route leads to the same place: use of the unpublished orders as persuasive authority. Under the majority's approach, unpublished opinions could always be used to support a result, despite the long-standing principles disfavoring such reliance.
*141 Second, the ultimate outcome of this issue should not depend upon whether there is statutory liability, but upon whether the insurance policies provide coverage when read in a fair, reasonable, and sensible way.
Third, the better-reasoned and majority of cases at this point go the other way.
Finally, the policy language in the Boeing order is different enough that reliance on that unpublished order is even less convincing.
I believe the majority finds coverage for which the parties did not contract. I would hold that the policies at issue provide no coverage for retroactive liability under CERCLA where the insured had no involvement with the damaged site during the policy period. For the reasons stated in this opinion and in the dissenting opinion of Justice Talmadge, I dissent.
TALMADGE and BRIDGE, JJ., concur.
TALMADGE, J. (dissenting).
I respectfully dissent. The majority misunderstands the nature of excess liability insurance coverage and incorrectly treats the issue of aggregate annual limits of liability under the Fireman's Fund Insurance Co. (Fireman's Fund) and Commercial Union Company (Commercial Union) insurance policies at issue in this case. I would reverse the trial court's partial summary judgment in favor of Weyerhaeuser Company (Weyerhaeuser) and grant Commercial Union's motion for partial summary judgment, finding its excess liability insurance policy sold to Weyerhaeuser contained an annual aggregate $1.5 million coverage limit for property damage. I would also affirm the trial court's determination the Fireman's Fund insurance policy had a $500,000 aggregate annual property damage limit of liability.
A. Principles of Insurance Contract Construction
I generally agree with the majority's articulation of insurance policy interpretation principles. The interpretation of insurance policies is a question of law. Weyerhaeuser Co. v. Aetna Cas. & Sur. Co., 123 Wash.2d 891, 897, 874 P.2d 142 (1994). We look to the whole insurance contract in interpreting it, giving the contract a "`fair, reasonable, and sensible construction'" as understood by the average person purchasing insurance. Am. Nat'l Fire Ins. Co. v. B & I Trucking & Constr. Co., 134 Wash.2d 413, 427, 951 P.2d 250 (1998) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994)). In effect, we look to the context of the policy's purchase so that our interpretation of it avoids strained or absurd consequences. Trans. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys., 111 Wash.2d 452, 457, 760 P.2d 337 (1988).
In general, we enforce an insurance contract as written if the contract is clear and unambiguous. Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997). If there are ambiguities in the policy language, we may resort to extrinsic evidence to ascertain the intent of parties. Am. Nat'l Fire Ins. Co., 134 Wash.2d at 427-28, 951 P.2d 250. An ambiguity is generally defined as language susceptible to two different reasonable interpretations. Weyerhaeuser, 123 Wash.2d at 897, 874 P.2d 142. If we cannot resolve any ambiguities in the policy language by our interpretation, including the resort to extrinsic language, any ambiguities are resolved in favor of the insured. Id.
B. Weyerhaeuser's Insurance Program
In the present case, for the time period from 1970 to 1973,[1] Weyerhaeuser purchased primary insurance coverage with Fireman's Fund. The trial court found the Fireman's Fund policy contained an aggregate annual property damage limit of liability of $500,000. Thereafter, Weyerhaeuser had layers of coverage with Employers Surplus Lines Insurance Company (the predecessor to Commercial Union) (referred to hereinafter as Commercial Union), Insurance Company of the State of Pennsylvania (ICOSP), New Hampshire Insurance Company, and *142 the underwriters at Lloyd's.[2] The Commercial Union policy purported to provide liability coverage to Weyerhaeuser for the period for March 1970 to March 1973.[3] The Commercial Union policy was specifically an "excess policy" and provided coverage for personal injuries, property damage, workmen's compensation, occupational disease, employer's liability, and employees' benefits liability. The policy specifically indicated Commercial Union's excess coverage commenced only upon the exhaustion of the underlying insurer's (Fireman's Fund) limits of liability, stating:
It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows: $500,000 ultimate net loss in respect of each occurrence, but $500,000 in the aggregate for each annual period during the currency of this Policy separately in respect to Products Liability and separately in respect to Personal Injury (fatal or not-fatal) by Occupational Disease sustained by any employees of the Assured and the Underwriter shall then be liable to pay on the excess thereof.
Clerk's Papers at 2748. As the trial court properly determined, the parties clearly contemplated the underlying aggregate annual limits of liability for the Fireman's Fund coverage would be $500,000. Commercial Union's obligation to insure commenced upon the $500,000 being paid out or obligated to be paid out by Fireman's Fund.
The Commercial Union policy then went on to state it would pay in excess to the Fireman's Fund insurance coverage "up to a further $1,500,000 ultimate net loss in all in respect of each occurrencesubject to a limit of $1,500,000 in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured." Clerk's Papers at 2748. The language employed in the reference to the underlying limits and the limit of Commercial Union's own coverage is identical.
Both parties agree this limitation language in the Commercial Union policy provides a per occurrence limit of $1,500,000 of coverage. The parties disagree, however, as to whether the further language providing for an aggregate annual $1,500,000 limit was designed to provide a general aggregate annual limit for property damage, or merely aggregate annual limits each for the specific product liability and personal injury by occupational disease coverages, respectively. Commercial Union argues the aggregate limitation clause means an aggregate limit of $1,500,000 for product liability coverage, an additional aggregate limit of $1,500,000 for occupational disease coverage, both of which are specified in the clause; and a third aggregate limitation category, not specified in the clause, of $1,500,000 for property damage. Weyerhaeuser argues this third aggregate limitation category does not exist, and the majority agrees.
The majority opinion relies on a bare statement that the aggregate damage clause is not ambiguous, and quickly moves on without analysis. Majority op. at 123. It then applies this judicial fiat to the supplemental aggregate clause. Majority op. at 124. To paraphrase Gertrude Stein, but there is no there there. There is no underlying analytical or legal principle articulated by the majority leading to its bare announcement that the aggregate damages clause leads unambiguously to the conclusion the parties intended to contract for a $4.5 million aggregate annual limit.
While the language in the Commercial Union policy is not a picture of clarity, the meaning of the policy and the resulting allocation of millions of dollars of liability between Weyerhaeuser and Commercial Union should not be dismissed without analysis. Rather, having rightly determined the policy language is ambiguous, we should seek its *143 meaning by referring to the commercial context in which the policy was sought, written, and purchased. "Where two commercial entities sign a commercial agreement, we will give such an agreement a commercially reasonable construction." Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wash.2d 692, 705, 952 P.2d 590 (1998) (footnote omitted).[4]
C. The Commercial Context of the Commercial Union Policy
In order to interpret the Commercial Union excess liability insurance coverage afforded to Weyerhaeuser for the period from 1970 to 1973, we must examine the context in which Weyerhaeuser purchased the insurance coverage and the nature of the coverage it purchased. Weyerhaeuser is one of Washington's major corporations and a Washington court can certainly take judicial notice of Weyerhaeuser's business sophistication and ability to fend for itself while making arm's length insurance contracts with equally sophisticated insurance companies.[5] Weyerhaeuser employeda Director of Insurance whose responsibility included the placement of necessary insurance coverage. This Director of Insurance worked with Marsh & McLennan, a large national insurance brokerage firm. This brokerage firm worked both with the insured and with insurers in placing coverage for Weyerhaeuser.
Given the nature of Weyerhaeuser's extensive business activities, it purchased insurance coverage in layers. See, e.g., Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 793, 881 P.2d 1020 (1994). In the ordinary case, excess or umbrella coverages are designed to pick up where the primary insurance coverage leaves off, providing an excess layer of coverage above the limit of the primary policy. Thompson v. Grange Ins. Ass'n, 34 Wash.App. 151, 156-57, 660 P.2d 307, review denied, 99 Wash.2d 1011 (1983). In fact, such excess policies are designed to protect against gaps in coverage. Prudential Prop. & Cas. Ins. Co. v. Lawrence, 45 Wash.App. 111, 119, 724 P.2d 418 (1986). See also Rees v. Viking Ins. Co., 77 Wash. App. 716, 719, 892 P.2d 1128, 1130 (1995) (excess insurance obligation to defend and indemnify commences only when limits of underlying policy are exhausted); Truck Ins. Exch. v. Century Indemn. Co., 76 Wash.App. 527, 531, 887 P.2d 455 (1995) (same).
Weyerhaeuser's decision to place its insurance coverage in layers above the Commercial Union coverage reveals the relevant commercial context. It would be absurd in such a setting to construe the Commercial Union policy to provide unlimited property damage coverage when Weyerhaeuser sought property damage coverage in layers above the Commercial Union policy.
The underlying Fireman's Fund policy unambiguously contains an aggregate annual limit of coverage for property damage of $500,000:
As respects Coverage B [property damage], subject to the above limit for one occurrence or accident, the aggregate limit of the Company's liability for all damages shall be $500,000.
Clerk's Papers at 408. The level of coverage provided by ICOSP, excess to the Commercial Union policy, described the underlying limits that had to be exhausted before its coverage commenced. Marsh & McLennan described this underlying set of policy limits as follows:
2. Provided always that liability attaches to the Company only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective *144 ultimate net loss liability as follows:
BODILY INJURY AND PROPERTY DAMAGE COMBINED: $2,000,000
Ultimate net loss each occurrence and in the aggregate
In any one Policy year in respect of Property Damage (other than Automobile Property Damage Liability), Products Liability, and Occupational Disease ...
Clerk's Papers at 11357. Thus, it is very clear the ICOSP policy in the layer above the Commercial Union policy contemplated underlying annual property damage aggregate limits of $500,000 for the Fireman's Fund policy and $1,500,000 for the Commercial Union policy.
It is reasonable to believe in placing layered insurance coverage, a sophisticated corporation like Weyerhaeuser, using its insurance department and Marsh & McLennan, would place coverage in consistent layers of coverage built one upon the other. If in fact the Commercial Union policy provided unlimited property damage coverage, there would have been no need for Weyerhaeuser to purchase yet another layer of coverage for property damage, as it did in the ICOSP policy. In this case, the broker, at the request of the insured, bought layers of liability insurance coverage with aggregate annual limits of liability coverage that dovetailed with one another.
Moreover, the declarations page of the Commercial Union policy makes clear the insurer provides coverage in the amount of "$1,500,000 excess of $500,000."[6] Clerk's Papers at 2750.
Finally, this interpretation is most consistent with the identical language contained in the limits of liability section of the policy for the underlying limits and the Commercial Union limits. Both parties concede Fireman's Fund's policy had an aggregate annual limit of property damage coverage. Br. of Appellant at 34; Br. of Resp't/Cross Appellant at 20. Insofar as the limits language in the Commercial Union policy was essentially identical, we should give the language the identical interpretation effect. Holter v. Nat'l Union Fire Ins. Co., 1 Wash.App. 46, 50, 459 P.2d 61 (1969).
As the parties here essentially agree, the language of the Fireman's Fund liability policy afforded Weyerhaeuser coverage up to an annual aggregate limit of $500,000, I would affirm the trial court's ruling to that effect.
In conclusion, Commercial Union afforded liability insurance coverage for property damage to Weyerhaeuser from 1970 to 1973. The agreement provided an aggregate annual limit of liability insurance coverage to Weyerhaeuser in the amount of $1,500,000 for the property damage coverage. This annual aggregate limit of insurance coverage is consistent with the language of the Commercial Union policy and its declaration page. Moreover, the limit is consistent with the context of Weyerhaeuser's placement of excess liability insurance coverage, given Commercial Union's place in the layers of coverage afforded to Weyerhaeuser. I would remand the case to the trial court for further proceedings consistent with this determination as to the existence of an annual aggregate limit of property damage liability insurance coverage under both the Commercial Union and Fireman's Fund insurance policies.
JOHNSON, MADSEN, and BRIDGE, JJ., concur.
NOTES
[1] The legislature instructed, "Because it is often difficult or impossible to allocate responsibility among persons liable for hazardous waste sites and because it is essential that sites be cleaned up well and expeditiously, each responsible person should be liable jointly and severally." RCW 70.105D.010(5) ("Declaration of policy."). The MTCA is "liberally construed to effectuate [its] policies and purposes...." RCW 70.105D.910.
[2] The settlement negotiation documents and the briefing are sealed.
[3] During the two-month stub period the supplemental policy specified limits of $1,000,000 in excess of the Fireman's Fund $1,000,000 primary policy limits for this period (CP at 8940), but this is not relevant to resolve the issues raised.
[4] There are no relevant factual disputes pertaining to this issue.
[5] An aggregate limit defines an insurer's total liability under a policy. Jeffrey W. Stempel, Law of Insurance Contract Disputes, § 9.03 [a] [2] at 9-62 (2d ed.1999). See also Cont'l Ins. Co. v. PACCAR, Inc., 96 Wash.2d 160, 164-65, 634 P.2d 291 (1981).
[6] Coverage limits, as shown in brackets, may be found at Plaintiff's Trial Ex. 3 at WEY0 000553.
[7] We note a "battle of the footnotes" regarding the agency relationship that allegedly exists between the parties in this case and Marsh & McLennan, an insurance consulting firm that worked on the supplemental and underlying policies, CP at 11438-39; Def.'s Trial Ex. 2592 at WEY4 318653. However, we also note that at no point, either explicitly or implicitly, has Weyerhaeuser argued it should not be bound by any contract because of this agency relationship. Thus, we need not consider the agency law implications, if any, of CU and Marsh & McLennan's relationship in interpreting the plain language of the contract. See U.S. Life Credit Life Ins. Co., 129 Wash.2d at 571 n. 2, 919 P.2d 594 (court will not consider agency law implications not properly before it).
[8] CU's original motion is apparently a Motion to Alter or Amend Judgment, CR 59(h), although it is not denominated as such. As such, the denial is properly appealable. RAP 2.2(a)(9).
[9] The supplemental policy contains a clause providing that if any loss covered by CU is also covered by prior insurance, CU's liability will be reduced "by any amounts due to the Assured on account of such loss under" prior insurance. Pl.'s Trial Ex. 3 at WEYO 000552, at ¶ 1. We have upheld similar clauses in the context of settlements received from tortfeasors. See, e.g., Thiringer v. Am. Motors Ins. Co., 91 Wash.2d 215, 219, 588 P.2d 191 (1978). But there is a clear distinction between a settlement received from a tortfeasor and one received from an insurance company to which a premium has been paid for coverage.

The supplemental policy also contains an "OTHER INSURANCE" clause that arguably could apply to limit CU's liability. Pl.'s Trial Ex. 3 at WEYO 000552, at ¶ 5. However, CU has not chosen to invoke that clause. Further, an analysis of an "other insurance" clause requires the other applicable insurance policies to be before the court. See Millers Cas. Ins. Co. v. Briggs, 100 Wash.2d 9, 12, 665 P.2d 887 (1983). Although both the supplemental policy and the underlying Fireman's Fund policy are part of the record in this case, no other insurance policy has been submitted to this court. See Commercial Union v. Weyerhaeuser, No 42024-1-I, Stipulation and Order Regarding Agreed Trial Exhibits (July 22, 1998).
[10] We do not find Weyerhaeuser's figures are necessarily correct; rather, we simply recognize there is substantial evidence to support the trial court's resolution of this factual dispute.
[11] Weyerhaeuser shipped waste to Pasco between July 1973 and November 1974 (CP at 7099), and it shipped waste to Mid State "from early 1974 until the landfill's closure in 1979." CP at 11942.
[12] Comprehensive general liability (CGL) policies may be "occurrence" policies or "claims-made" policies. "Claims Made policies simply limit their coverage to claims first made against the insured during the policy period, whereas Occurrence policies cover claims made against the insured at any time, so long as the bodily injury or property damage at issue occurred `during the policy period.'" Abraham, supra, at 92 n. 1. Occurrence policies insure for unknown liabilities that may occur after the expiration of the policy, and coverage is "essentially open-ended so long as the injury or damage occurs during the policy period." A.C. Label Co. v. Transamerica Ins. Co., 48 Cal.App.4th 1188, 1196, 56 Cal.Rptr.2d 207, 211 (1996) (Premo, A.P.J., dissenting).
[13] ER 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
ER 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
[14] The Federal Rules of Evidence Advisory Committee's Note on the identically worded Fed. R.Evid. 702 states:

An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge. The most common source of this knowledge is the expert witness, although there are other techniques for supplying it.
(quoted in Robert H. Aronson, The Law of Evidence in Washington 702-1 (3d ed.1998)). The official comment to ER 702 states "[t]his rule is the same as Federal Rule 702 and is consistent with previous law giving the court broad discretion to determine whether a witness is qualified to express an expert opinion." Washington Court Rules at 131 (1999). See also 5B Karl B. Tegland, Washington Practice: Evidence Law and Practice § 702.1, at 30 (4th ed.1999) (citing Advisory Committee Note on Fed.R.Evid. 702 to support fact that Washington ER 702 "reflect[s] the widelyheld view that a reasoned evaluation of the facts is often impossible without the proper application of scientific, technical, or specialized knowledge.").
[15] When insureds are forced to file suit to obtain the benefit of their insurance contract, they are entitled to attorneys' fees. Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 52-53, 811 P.2d 673 (1991).
[16] CU has not appealed the ruling that the Fireman's Fund policy limits were exhausted and concedes it is obligated to defend new property damage claims asserted against Weyerhaeuser after the date of exhaustion.
[17] On review of an order granting or denying summary judgment, we consider only the evidence and issues called to the attention of the trial court. RAP 9.12. The order granting or denying summary judgment shall designate the documents and other evidence the trial court considered. Id.
[1] The majority, at 130, quotes the Court of Appeals decision in Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 64 Wash.App. 838, 888, 827 P.2d 1024 (1992), aff'd, 126 Wash.2d 50, 882 P.2d 703, 891 P.2d 718 (1995) for the proposition that this court has rejected public policy arguments against insurers being obligated to indemnify for retroactive liability under CERCLA. The majority's selective quotation suggests that this case, like other Washington cases, involves the insurers' lack of advance knowledge of potential liability under the later enacted CERCLA, but this circumstance has no bearing on the insurers' duty to indemnify.

Neither Queen City Farms nor Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 784 P.2d 507 (1990), cited in the quotation, involved CERCLA liability based upon the insured's acts antedating relevant insurance policy periods. In each of those cases, the factual allegations were that the insured's polluting acts occurred during the policy periods. The case now before the court does not concern retroactive statutory liability where the acts of the insured giving rise to the liability occurred during the relevant policy period.
The quoted material is meaningless in the factual circumstances of this case.
[2] The complaint alleged other shipments may have occurred, but the insured failed to produce evidence that any shipments occurred during the policy period.
[3] In footnote 13, majority at 129, the majority seems to suggest that the fact that an occurrence-based policy is involved favors the majority's result. While the footnote notes the distinction between a claims-made and an occurrence-based policy, the fact occurrence-based policies are at issue here does not favor the majority's result. Occurrence-based policies require an event which causes injury within the policy period. Later enacted statutes may result in the insured's liability for some occurrences when there was no statutory liability for them at the time the parties contracted for insurance coverage. An occurrence-based policy may thus be "open-ended" to the extent it may require indemnification in such circumstances. However, in the end, footnote 13 does not say anything meaningful in the context of this case, because this case does not involve merely a later change in the law giving rise to the insured's liability. Instead, the issue concerns later enacted statutory liability arising from the insured's acts occurring after the policy expired.
[1] Weyerhaeuser purchased liability insurance coverage in layers from the early 1950's to mid 1980's. It undertook to self-insure an initial coverage layer starting in the late 1970's.
[2] Unfortunately, the parties have not made the policies of New Hampshire Insurance Co., nor the policies of the underwriters at Lloyd's a part of the record in this case.
[3] An endorsement to the policy extended coverage for the two months before the commencement of the policy. And a later endorsement terminated coverage one month early.
[4] It is interesting to note the underlying Fireman's Fund policy contains an introductory page with the words, "An insurance program especially prepared for Weyerhaeuser Company arranged by Marsh & McLennan, Inc." Clerk's Papers at 383. The Commercial Union policy we are considering was simply one portion of the insurance program Weyerhaeuser negotiated and purchased. We must, therefore, in construing the policy, examine it as one element of the entire insurance program, and not in isolation.
[5] "Weyerhaeuser is the world's largest private owner of merchantable softwood timber and the world's largest producer of softwood lumber and market pulp. It is also the top forest products exporter in the U.S. and among the top U.S. exporters overall." The company had sales of $10.8 billion in 1998. Weyerhaeuser in Action: Fact Sheets (July 2000), available at http://w ww.weyerhaeuser.com/facts/weyer.htm.
[6] This declarations page indicates Commercial Union charged Weyerhaeuser a premium of $139,889.45 for the three years of coverage. Unfortunately, we have no information regarding the differential in premium that would have been charged by Commercial Union for coverage from 1970 to 1973 for a policy without an annual aggregate limit of property damage coverage. This information might not be entirely helpful insofar as the insurers very likely could not, and did not, anticipate the large increase in their risk occasioned by the enactment of the Comprehensive Environmental Response, Compensative, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675.