26 P.3d 910 (2001)
144 Wash.2d 130
PANORAMA VILLAGE CONDOMINIUM OWNERS ASSOCIATION BOARD OF DIRECTORS, Petitioner,
v.
ALLSTATE INSURANCE COMPANY, Respondent.
No. 69696-9.
Supreme Court of Washington, En Banc.
Argued February 1, 2001.
Decided July 12, 2001.
*912 Reed, McClure, Pamela A. Okano, Seattle, Amicus Curiae on Behalf of State Farm Fire & Casualty Co.
Stanislaw & Ashbaugh, John Stephen Riper, Todd Christopher Hayes, Seattle, for Petitioner.
Bullivant, Houser, Bailey, Jerret E. Sale, Seattle, Bullivant, Houser, Bailey, Lisa E. Lear, Douglas G. Houser, Portland, for Respondent.
*911 SANDERS, J.
This appeal presents two issues: (1) In a case of progressive "hidden decay" which risks direct physical loss involving the collapse of an insured building, at what point is an insured's suit against an insurer barred by a policy provision which limits such suits to those commenced "within one year after a loss occurs," and (2) When a plaintiff is entitled to an award of reasonable attorney fees pursuant to Olympic Steamship,[1] are costs limited to those expenses enumerated in the cost recovery statute?
We construe this insurance contract to mean exactly what it says. Where a policy protects against risk of direct physical loss from hidden decay and requires the insured to bring suit within one year after a loss occurs, the date of loss is the earlier of either (1) the date of actual collapse or (2) the date when the decay which poses the risk of collapse is no longer obscured from view. We also conclude an award of reasonable attorney fees made pursuant to Olympic Steamship necessarily includes all expenses incurred to establish coverage under an insurance policy and is not limited to those expenses enumerated as recoverable statutory costs in RCW 4.84.010. We therefore reverse the Court of Appeals and reinstate the trial court's judgment in favor of Panorama Village.

FACTS
Panorama Village is a four building condominium complex consisting of 54 units located in Redmond, Washington. The buildings were all constructed at the same time during the late 1970s. Throughout its existence the property has demonstrated a history of maintenance problems. During late 1995 and early 1996 Panorama experienced an increase in maintenance problem reports.
In May 1996 a team of investigators headed by architect Norman Sandler conducted a walk-through investigation at the Panorama Village complex. Sandler was unable to determine on the basis of the walk-through the presence of hidden decay. Consequently he recommended a program of selective demolition be conducted later that summer.
This selective demolition required the team to remove exterior siding from the complex. With the siding removed, Sandler was able to examine the structural support of the building which he had been unable to see during the walk-through investigation. Sandler then determined the complex was at risk of collapse due to dry rot.
On July 3, 1996, Panorama submitted a claim to Allstate Insurance Company for coverage under its policy. Allstate did not pay the claim. Relevant provisions of the Allstate policy provide as follows:
CollapseParts One and Two
We will pay for risk of direct physical loss involving collapse of a covered building or any part of a covered building caused only by one or more of the following:
. . . .

*913 b. hidden decay;
. . . .
Clerk's Papers (CP) at 821.
Losses Covered Under Coverage A.
This policy insures your covered property for loss or damage resulting from direct physical loss, except for those Losses We Do Not Cover listed below.
CP at 825.
12. Legal Action Against Us
Persons insured agree not to take any legal action against us in connection with your policy unless you have first complied with all of its terms. Persons insured also agree to bring any action against us that relates to Coverage A within one year after a loss occurs.
CP at 855.
Panorama filed suit on August 5, 1996, one month after it reported its loss to Allstate. Allstate defended on a number of grounds, raising the one-year limitation of suit clause as an affirmative defense.
The trial court rendered declaratory judgment that:
1. Plaintiff's property is at risk of direct physical loss involving collapse.
2. The predominant cause of the risk of collapse at plaintiff's property is decay.
3. The decay that is the predominant cause of the risk of collapse at plaintiff's property is, as a matter of law, "hidden."
This relief disposes of Allstate's Second, Third, and Fifth Affirmative defenses as they relate to the risk of collapse claim. Those defenses are therefore dismissed as to plaintiff's risk of collapse claim.
CP at 1944-45 (footnotes omitted). Allstate's 10th affirmative defense, the one-year suit limitation clause, was also dismissed by Judge Richard D. Eadie on summary judgment.
The parties then reached a partial settlement. The stipulation reflects an agreement that the only matters left to be resolved at trial involved the scope of repair, relocation costs, and attorney fees.
A bench trial proceeded on these issues. The court ruled in favor of Panorama and ordered Allstate to fund the repair of Panorama's property. The court also awarded reasonable attorney fees including expert witness fees to Panorama pursuant to Olympic Steamship.
On appeal Allstate challenged the summary judgment orders and the award of reasonable attorney fees, specifically referencing inclusion of expert witness fees. By published opinion Division One of the Court of Appeals reversed and remanded. Panorama Vill. Condo. Owners Ass'n v. Allstate Ins. Co., 99 Wash.App. 271, 992 P.2d 1047 (2000).
Chief Judge Susan R. Agid of the Court of Appeals found the suit limitation provision of the contract began to run when Panorama knew or reasonably should have known that the loss was occurring and remanded for fact finding. Panorama Village, 99 Wash.App. at 280-81, 992 P.2d 1047. The court also held the trial court had erred when it determined the term "`hidden'" meant "`out of sight'" or "`concealed'" rather than "`known.'" Id. at 281, 992 P.2d 1047 (quoting Webster's Third New International Dictionary 1065 (1966)). Finally the court held while Panorama was properly awarded attorney fees it was error for the trial court to include additional expenses not enumerated in RCW 4.84.010. Id. at 286, 992 P.2d 1047. Panorama sought, and we granted, review.

ANALYSIS

Issue IOne-year suit limitation clause
The first issue turns on the language of the insurance contract. We recently reiterated the criteria for interpreting an insurance contract in Weyerhaeuser Co. v. Commercial Union Insurance Co.:
"In Washington, insurance polices are construed as contracts. An insurance policy is construed as a whole, with the policy being given a `fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. If the clause *914 is ambiguous, however, extrinsic evidence of intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable."
142 Wash.2d 654, 665-66, 15 P.3d 115 (2000) (quoting Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 427-28, 951 P.2d 250 (1998)).
We recognize we must be guarded in our interpretation of an insurance contract as "[i]t is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves." Chaffee v. Chaffee, 19 Wash.2d 607, 625, 145 P.2d 244 (1943) (citing 12 Am.Jur. Contracts § 228, at 749).
Panorama asserts the Court of Appeals improperly, in effect, added language to the contract when it applied a "discovery rule" to the suit limitation provision. The suit limitation provision of the policy simply requires the insured to bring suit within one year "after a loss occurs" without reference to discovery or knowledge. The Court of Appeals opinion concludes the policy provisions which limit suit to those commenced within "one year after a loss occurs" mean up to one year after the insured first "knew or should have known of a `risk of direct physical loss involving collapse' caused by hidden decay in a specific part of the complex." Panorama Village, 99 Wash.App. at 280, 992 P.2d 1047 (quoting policy). Finding this to be a fact issue inappropriately resolved by summary judgment the Court of Appeals remanded for fact finding.
As previously noted, however, our construction of an insurance contract must be a "`fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" Weyerhaeuser Co., 142 Wash.2d at 666, 15 P.3d 115 (quoting B & L Trucking & Constr. Co., 134 Wash.2d at 427-28, 951 P.2d 250). "`[T]he proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract' but instead `whether the insurance policy contract would be meaningful to the layman ...'." Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 881, 784 P.2d 507 (1990) (quoting Dairyland Ins. Co. v. Ward, 83 Wash.2d 353, 358, 517 P.2d 966 (1974)).
Panorama argues a lay person would not read "after a loss occurs" to mean "during a loss" or "after the beginning of a loss" and therefore the provision permits an insured to pursue coverage rights within one year after a loss is over rather than merely within one year after a loss begins. The Court of Appeals rejected Panorama's argument holding public policy, common sense, and case law all require imposition of a discovery rule.
The Court of Appeals imposed the discovery rule based on its concern that "[a]ny other approach would either penalize unaware insureds or allow those who are aware of the condition to delay in repairing it until the insured property literally collapses." Panorama Village, 99 Wash.App. at 279, 992 P.2d 1047. However this case does not involve an unaware policyholder or a policy provision which might lend itself to that problem. As we recently said in Schwindt v. Commonwealth Insurance Co., 140 Wash.2d 348, 358, 997 P.2d 353 (2000), "[a]lthough public policy supports the fair treatment of insurers, this concern is secondary to the protection of insureds and innocent third parties." Moreover, in Boeing v. Aetna we observed, "Washington courts rarely invoke public policy to override express terms of an insurance policy." Boeing, 113 Wash.2d at 876 n. 1, 784 P.2d 507 (citing State Farm Gen. Ins. Co. v. Emerson, 102 Wash.2d 477, 481-83, 687 P.2d 1139 (1984); Progressive Cas. Ins. Co. v. Cameron, 45 Wash.App. 272, 282, 724 P.2d 1096 (1986)).
Here the express terms of the contract require the policyholder to bring an action within one year "after a loss occurs." The language of the contract must be afforded "`fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" Weyerhaeuser Co., 142 Wn.2d at 666, 15 P.3d *915 115 (quoting B & L Trucking & Constr. Co., 134 Wash.2d at 427-28, 951 P.2d 250). "Undefined terms in an insurance contract must be given their `plain, ordinary, and popular' meaning"; and "To determine the ordinary meaning of an undefined term, our courts look to standard English language dictionaries." Boeing, 113 Wash.2d at 877, 784 P.2d 507.
Webster's Third New International Dictionary 38 (1981) defines "after," "adj. ... 1: NEXT: later in time: SUBSEQUENT, SUCCEEDING." A plain, ordinary reading of the contract suggests the policyholder must bring an action for coverage within one year subsequent to or succeeding the loss. This must be distinguished from a contract which requires a policyholder to bring a coverage action within 12 months after the inception of a loss. "Inception" is defined as "an act, process, or instance of beginning." Id. at 1141. An "after inception" suit limitation provision requires the policyholder to bring an action for coverage within a time certain subsequent to the beginning of the loss.
Of the two types of suit limitation provisions the latter clearly provides greater protection to the insurance company where a progressive loss is concerned. But this coverage does not have such a provision. Nor does this coverage expressly impose a discovery rule for purposes of determining when the suit limitation provision begins to run.[2] The policy simply states the suit must be brought within one year "after a loss occurs." CP at 855. Under the appellate court's analysis the claim must be brought within one year after Panorama knew or reasonably should have known of the loss. This approach is inconsistent with policy text.
The Court of Appeals relies heavily on a case from the California appellate courts, Magnolia Square Homeowners Ass'n v. Safeco Insurance Co., 221 Cal.App.3d 1049, 271 Cal.Rptr. 1 (1990). In Magnolia Square the court observed that the insurance policy in question actually used the words "`loss occurs'" rather than the term "`inception of the loss'" as required under California law. Id. at 6 n. 3. The court ultimately determined the difference was trivial. Id.
Here, the Court of Appeals erroneously attributed importance to Magnolia Square's characterization of the discrepancy as trivial. The Court of Appeals ignores that California law requires suit limitation provisions to use the "after inception of the loss" language. Cal. Ins.Code § 2071, at 63 (West 1993). However the situation in Washington is quite different. We have no statutorily imposed suit limitation clause for insurance contracts. Thus while Magnolia Square had the luxury of characterizing the difference in the terms used as trivial, we do not.
Here the plain language of the clause at issue provides coverage "for risk of direct physical loss involving collapse of a covered building" by "hidden decay." CP at 821. Therefore the peril insured against continues to exist until at least the earlier of either (a) actual collapse or (b) the end of "hidden decay."
"Hidden" is not, however, defined by the policy.
Panorama argues the term means "out of sight" or "concealed." Allstate argues decay is not "hidden" if Panorama knew or reasonably should have known that the decay existed. The Court of Appeals correctly noted since the term was not defined in the contract, courts "must interpret the plain meaning of the term as `it would be understood by the average [person], rather than in a technical sense.'" Panorama Village, 99 Wash.App. at 281, 992 P.2d 1047 (quoting Dairyland Ins. Co., 83 Wash.2d at 358, 517 P.2d 966) (alteration in original).
The Court of Appeals then properly looked to a standard English language dictionary to determine the plain meaning of the term "hidden." Upon examination of Webster's Third New International Dictionary the court found Panorama's definition ("out of sight") was the first listed. Id. at 281. Notwithstanding, the court summarily dismissed Panorama's proposed definition, opining the only reasonable interpretation of the term *916 "hidden" is "`undisclosed' or `unknown.'" Id.
Moreover the appellate court asserted the term was not ambiguous and therefore need not be construed in Panorama's favor. But even Allstate concedes "`hidden' can mean out of sight, just as it can mean concealed...." Appellant's Br. at 41-42. As previously noted, a clause is ambiguous if it is subject to two reasonable interpretations. Weyerhaeuser Co., 142 Wash.2d at 666, 15 P.3d 115. Panorama's interpretation is reasonable because it encompasses the plain meaning of the word "hidden" as defined by Webster's Third New International Dictionary.
While the Court of Appeals correctly articulated the proper rule of contract interpretation it failed to apply it.
"The industry knows how to protect itself and it knows how to write exclusions and conditions." Boeing, 113 Wash.2d at 887, 784 P.2d 507. If Allstate intends "hidden" to mean "unknown," it must say so. Further, to the extent the term is ambiguous, it must be construed against the insurer. "It is Hornbook law that where a clause in an insurance policy is ambiguous, the meaning and construction most favorable to the insured must be applied...." Dairyland Ins. Co., 83 Wash.2d at 358, 517 P.2d 966. See also Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 64, 1 P.3d 1167 (2000) ("Policy ambiguities, particularly with respect to exclusions, are to be strictly construed against the insurer.").

Issue IIExpert witness fees as part of reasonable attorney fees
The Court of Appeals found the trial court abused its discretion by awarding necessary expenses of litigation as part of a reasonable attorney fee. Panorama asserts these expenses, which included Westlaw charges and expert witness fees, were necessary to establish coverage. Conversely, Allstate asserts the insured may not recover any "cost" not expressly set out in RCW 4.84.010.
It must be noted that there is a difference between an entitlement to collect "reasonable attorney fees" and an entitlement to collect those statutory "costs" enumerated in RCW 4.84.010. "Costs have historically been very narrowly defined, and RCW 4.84.010 limits cost recovery to a narrow range of expenses such as filing fees, witness fees, and service of process expenses." Hume v. Am. Disposal Co., 124 Wash.2d 656, 674, 880 P.2d 988 (1994) (citing Nordstrom, Inc. v. Tampourlos, 107 Wash.2d 735, 743, 733 P.2d 208 (1987)). However, the right to recover "reasonable attorney fees" is not so limited by statutory definition. For instance in Louisiana-Pacific Corp. v. Asarco Inc., 131 Wash.2d 587, 604, 934 P.2d 685 (1997) we held the right to recover "reasonable attorney fees and costs" pursuant to RCW 70.105D.080 includes expenses in addition to RCW 4.84.010 costs ("[T]he court is authorized to additionally award other reasonably necessary expenses of litigation based upon such equitable factors as the court determines are appropriate."). Asarco Inc., 131 Wash.2d at 604, 934 P.2d 685. The phrase "reasonable attorney fees" in and of itself supports an award not limited by "costs" as described by RCW 4.84.010. Asarco Inc., 131 Wash.2d at 605, 934 P.2d 685 and see 131 Wash.2d at 605 n. 81, 934 P.2d 685 (citing Missouri v. Jenkins, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)) ("holding the term `reasonable attorney's fee' as used in 42 U.S.C. § 1988 `must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit[]'") (Sanders, J., concurring) (alteration in original). See Blair v. Wash. State Univ., 108 Wash.2d 558, 573-74, 740 P.2d 1379 (1987) (holding an award of reasonable attorney fees in civil rights actions is not limited to costs enumerated in RCW 4.84.010 ("The great weight of authority allows a prevailing civil rights plaintiff to recover reasonable expenses incurred.") (citing Palmigiano v. Garrahy, 707 F.2d 636 (1st Cir.1983) (reasonable and necessary costs include out-of-pocket expenses for transportation, lodging, parking, food, and telephone expenses))).
*917 Washington follows the American rule "that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of such fees is permitted by contract, statute, or some recognized ground in equity." McGreevy v. Or. Mut. Ins. Co., 128 Wash.2d 26, 35 n. 8, 904 P.2d 731 (1995) (citing Philip A. Talmadge, The Award of Attorneys' Fees in Civil Litigation in Washington, 16 Gonz. L.Rev. 57 (1980)). Here the parties have no contract regarding the litigation expenses. Nor does Panorama seek to recover costs pursuant to RCW 4.84.010 or any other statute. However reasonable attorney fees and expenses might also be awarded pursuant to "some recognized ground in equity." McGreevy, 128 Wash.2d at 35 n. 8, 904 P.2d 731.
We recognized such a ground in Olympic Steamship Co. v. Centennial Insurance Co., 117 Wash.2d 37, 53, 811 P.2d 673 (1991). Olympic Steamship stands for the proposition that, "When insureds are forced to file suit to obtain the benefit of their insurance contract, they are entitled to attorneys' fees." Weyerhaeuser Co., 142 Wash.2d at 687 n. 15, 15 P.3d 115 (quoting Olympic S.S. Co., 117 Wash.2d at 52-53, 811 P.2d 673).
The entitlement to necessary expenses as part of a reasonable attorney fee award also fulfills the rationale behind this equitable ground.
"When an insured purchases a contract of insurance, it seeks protection from expenses arising from litigation, not `vexatious, time-consuming, expensive litigation with his insurer.'" Olympic S.S. Co., 117 Wash.2d at 52, 811 P.2d 673 (quoting Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73, 79 (1986)). In light of this verity we have held "when an insurer unsuccessfully contests coverage, it has placed its interests above the insured"; and "[o]ur decision in Olympic Steamship remedies this inequity by requiring that the insured be made whole." McGreevy, 128 Wash.2d at 39-40, 904 P.2d 731.
It is the purpose of the Olympic Steamship exception to make an insured whole when he is forced to bring a lawsuit to obtain the benefit of his bargain with an insurer. To make such plaintiffs whole, "reasonable attorney fees" must, by necessity, contemplate expenses other than merely the hours billed by an attorney. The insured must therefore be compensated for all of the expenses necessary to establish coverage as part of those attorney fees which are reasonable. "Failure to reimburse expenses would often eat up whatever benefits the litigation might produce and additionally impose a backbreaking burden upon the small, but justified, litigants." Asarco Inc., 131 Wash.2d at 606, 934 P.2d 685 (Sanders, J., concurring).
To support its position that reasonable attorney fees should not include expert witness fees Allstate draws our attention to McGreevy, 90 Wash.App. 283, 951 P.2d 798. In McGreevy Division Three of the Court of Appeals determined it was proper for a trial judge to exclude expert witness fees when calculating costs. Id. at 296, 951 P.2d 798. Reaching its decision Division Three relied on this court's unanimous decision in Wagner v. Foote, 128 Wash.2d 408, 416-17, 908 P.2d 884 (1996) where we held, "Expert witness fees are not included in the definition of costs or recoverable as costs under RCW 4.84.030,.080 or RCW 2.40.010." (Footnotes omitted.) True enough, however, as can be seen Wagner sought recovery of statutory "costs," not "reasonable attorney fees." To the extent McGreevy can be read to exclude necessary expenses from an award of reasonable attorney fees it is disapproved.

CONCLUSION
The Court of Appeals erred when it held the suit limitation provision of this insurance policy barred recovery if suit were commenced more than one year after the insured knew of the condition but within one year of its concealment. Panorama timely commenced this suit against Allstate well within one year of the date the "hidden decay" was no longer "hidden," i.e., concealed from view.
The Court of Appeals also erred when it disallowed expert witness fees and other expenses necessary to establish coverage as part of a reasonable attorney fee allowed by Olympic Steamship. The Court of Appeals is reversed and the trial court is affirmed. *918 Panorama shall recover its costs and reasonable attorney fees on appeal.
ALEXANDER, C.J., SMITH, JOHNSON, IRELAND, BRIDGE, OWENS, JJ., concur.
MADSEN, J. (dissenting).
The majority rewrites the suit limitation clause in Allstate Insurance Company's policy to allow a cause of action against the insurer long after the insured knows or should know that a covered loss has occurred despite the one-year limitation period in the clause. The majority's construction of the suit limitation language "after a loss occurs" as meaning after a loss is over, together with its conclusion that a loss is not over while ongoing damage continues, flies in the face of the policy's coverage provisions.
The majority claims, though, that it is simply refusing to rewrite the policy language to provide for a discovery rule that the parties did not expressly include. Despite this innocuous sounding disclaimer, the majority, by its holding, converts the insurance coverage at issue from collapse coverage to maintenance and repair coverage, regardless of the fact that these parties plainly did not bargain for upkeep insurance. Rather than routine, everyday foreseeable maintenance costs, the parties contracted for insurance covering fortuitous losses, and specifically contracted for coverage for collapse losses resulting from hidden decay. Instead of construing this policy in a manner that remains true to the parties' fundamental bargain, the majority construes the policy so that the insured obtains the benefit of a bargain for which it has not paid maintenance and repair insurancewhile the insurer is denied the benefit of its bargainreceipt of premiums for coverage for collapse losses, with a one-year suit limitation period.
This fundamental alteration of the insurance contract should not be accepted under the guise of interpretation. Insureds are, without question, entitled to the insurance coverage for which they pay. But the insured is not the only party to the contract; both parties to the contract are entitled to fair treatment. This court should not encourage insureds to deliberately wear blinders so as to avoid seeing what is there to see. The unfortunate result of the majority's analysis, however, is that an insured is well advised to ignore any notice of ongoing decay damage, save the high cost of maintenance, and wait until the building actually collapses, i.e., falls down, or until the decay itself is finally visible to the eye. This result is contrary to the fundamental principle that insurance coverage is intended to indemnify for fortuitous events, not events which the insured anticipates and can avoid. The facts here present a classic case of an insured who, preferring to avoid costly repairs, simply waits until its building is in a state of collapse in order to shift the cost associated with rot, an uncovered loss, onto its insurance carrier.
Allstate has submitted abundant evidence that the insured had notice of problems with the structural integrity of its buildings due to rot. Panorama Village Condominium Owners Association Board of Directors (Panorama) brought suit in August 1996. By February 1995, 18 months earlier, entryway overhangs were in such bad shape that a contractor had to install temporary supports to keep them from collapsing. Thus, at a minimum, Panorama knew 18 months before suit that shoring was needed to avoid collapse of portions of the buildings. In addition, Allstate submitted evidence tending to show that problems arose shortly after the condominium complex was constructed which should have put Panorama on notice of damage due to decay. This evidence includes: Homeowners began to notice leaks in the early 1980's, and by 1983 Panorama knew of numerous roof leaks and leaks in and around decks. Experts told Panorama that water was getting into walls. Although some of the leaks were repaired, some old leaks continued and new ones occurred. In 1983, a contractor making repairs opened some exterior walls and found that structural members were impaired by decay. In 1989, Panorama had to rebuild stairs and replace structural timbers damaged by rot. Again in 1990, rot required rebuilding walls in two buildings. A 1991 inspection showed leaks and dry rot in several decks and rot in exterior trim. Panorama was warned that further structural damage would occur if leaks were not repaired. From 1993-95 a contractor making *919 some repairs inspected several areas of the complex and found that many decks had rot and water damage, and found decay in the interior of some buildings. He reported instances of rot and structural impairment and he bid on repair work, but Panorama authorized only about one-fourth of the repairs he indicated were needed. In February 1994, the homeowners' association board discussed rotting decks, but authorized only some repairs. By August, the contractor had to remove and rebuild adjoining walls in four units to remove rot; he also repaired decks and rotted beams and portions of stairways. He continued to report instances of structural impairment and decay, and he met with the board to explain the problem. In October 1994, an architect inspected the complex and reported conditions causing trapped water and decay. Walls and adjoining structures around decks were in various stages of decay, and there was rot in deck subfloorings and girder beams of some carports. The architect also reported entryway overhangs which were severely rotted and in need of immediate repair.
There is considerable evidence that Panorama knew or should have known of structural problems due to decay well over a year before it brought suit, and that Panorama put off making needed repairs. Nevertheless, the majority concludes Panorama's suit against Allstate is not time-barred because no building had actually fallen down, and, the majority says, decay was concealed from view.
I dissent.

Suit Limitation Clause
Under the Allstate policy, losses due to collapse are not covered, except as provided in the policy under "CollapseParts One and Two." Clerk's Papers (CP) at 821. Under "CollapseParts One and Two," the policy provides that "risk of direct physical loss involving collapse of a covered building or any part of a covered building" is covered if caused by certain enumerated things, including "hidden decay." Id. Plaintiff Panorama sought coverage under the "collapse provision" for damage caused by "hidden decay." Allstate claims that suit is barred by the suit limitation provision in its policy which states that the insured agrees to bring any action against Allstate "within one year after a loss occurs." CP at 855.
The issue is when the loss occurred for purposes of the suit limitation clause. The Court of Appeals held that a discovery rule applies and the one-year period commences when Panorama knew or should have known of substantial decay and structural damage. Panorama maintains, though, that use of the discovery rule is erroneous because the suit limitation provision provides that suit must be brought within 12 months "after" the loss occurs. Panorama reasons that the damage to its condominium complex was ongoing, and the loss was still occurring when it filed suit. Thus, it did not fail to file suit within one year after the loss occurred.
The majority agrees, saying that under a plain reading of the suit limitation clause, the insured must bring an action within one year subsequent to ("after") the loss, relying on dictionary definitions of the term "after." Majority at 915-916. The majority says that this point is reached at the earlier of actual collapse, i.e., when the building falls down, or when decay can be seen.
The claimed loss is for a collapse. As the Court of Appeals has correctly explained in another case, a structure is either in a "collapse" condition or it is not. Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co., 104 Wash.App. 597, 604, 17 P.3d 626, 629 (2001). In the case of hidden decay, at some point the structure, or part of it, will reach a stage of substantial impairment of structural integrity creating a risk of direct physical loss.[1] Whether it is known or unknown that that risk has arisen i.e., that a collapse loss has occurred a loss has in fact occurred. There may be additional damage after that point, or there may be additional parts of the structure (or additional units in a condominium *920 complex) which reach that point at a later time, but a covered loss has in fact occurred. The policy language does not say that suit must be brought within 12 months after the initial covered loss and all additional damage or additional covered losses are complete; it says that suit must be brought 12 months after the loss has occurred. The fact that damage due to decay continues does not mean that a covered loss has not occurred.
The critical question is not when ongoing damage ended; it is when a covered loss occurred. "After a loss occurs" means after a covered collapse loss occurs, not after additional ongoing damage occurs. The majority has improperly rewritten the policy language.
The question remains, when does a covered collapse loss occur? Coverage for a collapse loss is not like traditional property losses because
a collapse does not occur the minute one of the enumerated perils commences. Termites can begin eating studs and wood can begin to rot long before there is a collapse under any definition.
It would be difficult to determine when th[e] theoretical point of "collapse" is achieved for "hidden" decay.... By definition, decay ... must progress "secretly" to result in a covered collapse loss.
Paula B. Tarr, William S. Daskam IV & Herbert J. Baumann, Jr., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 35 Tort & Ins. L.J. 57, 85-86 (1999). Generally speaking, the time at which a loss occurs is easily determined where, for example, the loss is due to a fire or an earthquake. However, where latent or progressive damage occurs, the determination is not so easy. In the case of a collapse caused by hidden decay, the point at which a covered loss first occurs may be unknown or very difficult to ascertain.
In order to resolve the difficulty in determining when loss occurs in progressive or latent damage cases, courts have recognized an exception to the general rule regarding construction of suit limitation clauses. The general rule is that where an insurance policy covering risks connected to real property provides that its suit limitations period begins to run from the date of loss,
courts have generally adopted the plain meaning of the terms as the date of the loss or damage, or the date of the catastrophe insured against, as opposed to the date on which the loss was discovered, the date when the loss was ascertained, the date when proof of loss was rejected or the claim denied, or when the claim becomes due and the cause of action accrues.
17 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 236:22 (3d ed.2000) (footnotes omitted). However, "[i]n order to accommodate a claim involving latent or progressive damage, some jurisdictions have defined the date of loss in terms of knowledge or manifestation of the damage." 17 Couch on Insurance § 236:23; see also § 236:47 (noting that the discovery rule may be invoked for purposes of suit limitation provisions where the nature of the loss is progressive or latent).
The Court of Appeals' application of a discovery rule provides a fair balance that protects the interests of both the insured as well as those of the insurer.
In a similar context, determining when a loss occurs for purposes of determining which policy period applies to a collapse loss, commentators have noted:
For most property insurance claims, the date that the loss occurs is obvious. Windstorms, fires, explosions, thefts, earthquakes, and lightening almost always occur at a fixed point in time. Consequently, there is generally no dispute as to which policy period applies to such a loss. For long-term progressive losses, the timing of the loss is much more difficult to determine. Most property policies cover "property damage which occurs during the policy period." Under this definition, when does a long-term progressive loss occur?
Practically speaking, there are two times during which a collapse loss could be said to "occur" for purposes of insurance coverage: at the time of discovery, a "manifestation" trigger, or at the point in time when the decay and termite damage first caused substantial structural impairment, an "injury-in-fact" trigger. *921 35 Tort & Ins. L.J. at 77-78 (footnotes omitted).
If the injury-in-fact trigger is used, the one-year period can run before the insured is even on notice that a loss has occurred. This is obviously a harsh result, which can be avoided by use of a discovery rule approach. Application of the discovery rule in this case thus serves two important goals. It alleviates the difficulty of determining when in fact a collapse loss occurs, and it avoids expiration of the suit limitation period before the insured is even on notice of a covered loss. The fairness of this approach to both the insurer and the insured is demonstrated by the following cases from California.
Prudential-LMI Commercial Insurance v. Superior Court, 51 Cal.3d 674, 798 P.2d 1230, 274 Cal.Rptr. 387 (1990) is a leading case on this issue. In Prudential-LMI, the insured discovered, while laying carpet in 1985, that there was an extensive crack in the foundation and floor slab of an apartment building. The crack, it was learned later, was caused by expansive soil, and may have started shortly after the apartment complex was constructed in 1971. Prudential LMI argued, among other things, that a suit limitation clause in its policy had expired and therefore coverage was denied. The suit limitation clause provided that suit must be brought within 12 months "next after inception of the loss." Id. at 680, 274 Cal.Rptr. 387, 798 P.2d 1230.
The California court observed that some courts construing "inception of a loss" defined it as occurrence of the physical event causing the loss. Id. at 684, 274 Cal.Rptr. 387, 798 P.2d 1230. This strict construction approach, however, "may lead to an inequitable technical forfeiture of insurance coverage." Id. at 685, 274 Cal.Rptr. 387, 798 P.2d 1230. In contrast, in several California Court of Appeals cases the principle was advanced that the term "inception of the loss" means "that point in time at which appreciable damage occurs so that a reasonable insured would be on notice of a potentially insured loss." Id. The supreme court agreed, stating that "[w]e agree that `inception of the loss' should be determined by reference to reasonable discovery of the loss and not necessarily turn on the occurrence of the physical event causing the loss." Id. at 686, 274 Cal.Rptr. 387, 798 P.2d 1230. The court held that suit is timely if it is filed within one year after the "point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." Id. at 687, 274 Cal.Rptr. 387, 798 P.2d 1230. Determination of this point in time is a fact question. Id. at 687, 274 Cal.Rptr. 387, 798 P.2d 1230. The court cautioned that to take advantage of the delayed discovery rule, the insured must be diligent in the face of discovered facts. Id.
In another case decided earlier the same year as Prudential-LMI, the California Court of Appeal also applied a discovery rule. Magnolia Square Homeowners Ass'n v. Safeco Insurance Co., 221 Cal.App.3d 1049, 271 Cal.Rptr. 1 (1990). In Magnolia Square, the facts were markedly similar to those in the case before this court. The suit limitation period provided that suit must be commenced "within one year after the loss occurs." Id. at 1058, 271 Cal.Rptr. 1. The court concluded that the insured's suit was untimely, because its complaint contained allegations establishing that the insured had notice over a year before suit was brought that structural problems existed at its condominium complex. Id. at 1059-60, 271 Cal. Rptr. 1. The court observed that while the insured homeowners' association did not know the extent of the structural defects, it had a duty to act with diligence to discover the extent of the deficiencies. Id. at 1060, 271 Cal.Rptr. 1.
As these two California cases demonstrate, the delayed discovery rule inures to the benefit of both the insured and the insurer. It allows delay in bringing a suit on a policy until the insured knows or reasonably should know of the damage, thus preventing loss of coverage before the insured even has notice that damage has occurred. It also precludes suit where the insured knows or should know of damage but delays bringing suit, thus precluding an insured from unreasonably incurring greater damage as occurred in this case.
*922 A comparison of other cases demonstrates the appropriateness of applying a discovery rule in progressive loss cases involving collapse. In Davidson v. United Fire & Cas. Co., 576 So.2d 586 (La.Ct.App.1991), the issue was when a collapse of a building caused by termite damage occurred for purposes of determining whether coverage was provided by either of two insurance policies. The court assumed for purposes of its analysis that a collapse had occurred. The court held that the plaintiffs had the burden of establishing that a collapse occurred during one of the policy periods. Id. at 590. The court found no error in the trial court's conclusion that plaintiff's failed to prove coverage. The court essentially applied an injury-in-fact trigger, requiring proof of when a collapse actually occurred for purposes of determining whether the loss fell within a policy period. Two experts testified that there was no way to determine when extensive damage occurred within the walls or over how long a period of time it occurred. There was, however, some evidence that damage occurred prior to coverage by the two insurance policies. Davidson demonstrates the difficulty in proving a fact that may not be susceptible of proof where an injury-in-fact approach is followed.
In contrast, in O'Reilly v. Allstate Insurance Co., 474 N.W.2d 221 (Minn.Ct.App. 1991), the court applied a discovery rule. The question in O'Reilly was whether the insured's claim was barred by a one-year suit limitation clause that provided that "`any suit or action must be brought within one year after the date of loss.'" Id. at 222 (emphasis added) (quoting O'Reilly's policy). A severe thunderstorm cracked the basement walls of the insured's house, and she filed a claim that was denied because the damage was minimal and was caused by earth movement not covered by the policy. Over several years cracks in the house slowly spread, and over five years after the thunderstorm the damage suddenly accelerated, causing serious damage to the home which ultimately resulted in its condemnation. The insured filed a second claim, which was denied as untimely.
While the insured argued that the term "date of loss" is ambiguous, and should be resolved in favor of coverage, the court approached the issue differently. The court noted the phrase "date of loss" is similar to the more commonly used "inception of loss," which some other jurisdictions had construed to mean the date of the casualty causing the loss. Id. at 222-23. The court also noted that "when the insured's loss is progressive or latent, however, courts have been reluctant to interpret contractual limitations periods strictly," observing that the court in Prudential-LMI, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230, had held that in progressive damage cases the "inception of the loss" is the date of reasonable discovery of the loss. O'Reilly, 474 N.W.2d at 223. Under this approach, as noted above, "the suit limitation period begins to run after `appreciable damage occurs and is or should be known to the insured.'" Id. (quoting Prudential-LMI, 274 Cal.Rptr. at 395, 798 P.2d 1230).
The court adopted the California approach, stating: "This approach protects against potentially inequitable technical forfeitures of insurance coverage in progressive or latent loss cases where the time between the inception of the damage and its patency exceeds the applicable period." 474 N.W.2d at 223. The court concluded that there was a factual issue as to when the insured should actually have discovered the loss, and accordingly reversed summary judgment granted in favor of the insurer. Id.
Thus, contrary to Panorama's arguments and the majority's analysis, in progressive damage situations the discovery rule has frequently been applied to suit limitation provisions despite the lack of express "discovery" language in the policy. O'Reilly, Prudential-LMI, and Magnolia Square are well-reasoned decisions that this court should join.
The majority, however, accepts Panorama's contention that Magnolia Square, which was relied on by the Court of Appeals, is distinguishable and irrelevant because the California statutory one-year suit limitation provision requires suit to be commenced "`within 12 months next after inception of the loss,'" see Prudential-LMI, 51 Cal.3d at *923 680, 274 Cal.Rptr. 387, 798 P.2d 1230 (quoting statute), unlike Allstate's suit limitation provision requiring suit to be brought "within one year after the loss occurs" and this state's statutory requirement that in contracts of property insurance suit limitations provisions not be for "period[s] of less than one year from the date of the loss." RCW 48.18.200(1)(c).
The California courts have not, however, found this distinction of any significance. In Prudential-LMI, the court noted that an additional provision of the policy in that case provided that suit must be commenced within 12 months "next after the happening of the loss." 51 Cal.3d at 680 n. 2, 274 Cal.Rptr. 387, 798 P.2d 1230. The court concluded, however, that there was "no legal difference" between "inception" and "happening" for purposes of resolving the issue before it, i.e., when does the one-year period begin to run in a progressive property damage case. Id. at 680 n. 2, 274 Cal.Rptr. 387, 798 P.2d 1230. The California Court of Appeal in Magnolia Square similarly concluded that the fact that the suit limitation provision in the insurance policy provided that suit had to be commenced "within one year after the loss occurs," rather than "inception of loss" was a trivial difference, just as it had in an earlier case reasoned that the difference between "occurrence" and "inception of loss" was trivial. Magnolia Square, 221 Cal.App.3d at 1058, 1059 n. 3, 271 Cal.Rptr. 1.
More importantly, the difference in language actually works against Panorama, as the court in O'Reilly explained:
Although the [discovery] standard is derived from cases in which the policy limitation period is defined as commencing at the "inception of the loss," the standard applies even more logically to [the insured's] policy language, which commences the limitation period at the "date of loss." Unlike "inception," "date" does not restrictively modify loss, and the initiation of the limitation period depends only on the determination of when [the insured's] loss arose.

O'Reilly, 474 N.W.2d at 223 (emphasis added). The reasoning from O'Reilly applies here as well; "after a loss occurs" is more amenable to use of the discovery rule than the "inception of the loss" language. (As explained above, a collapse loss actually occurs at some point, although additional damage may be ongoing.)
Panorama complains, however, that the Court of Appeals relied on improper policy reasons for its decision, noting that the Court of Appeals rejected its continuing loss argument as involving an untenable position because it "would allow an insured who is fully aware of significant continuing property damage to wait until the property actually collapses before making a claim." Panorama Vill. Condo. Owners Ass'n v. Allstate Ins. Co., 99 Wash.App. 271, 277, 992 P.2d 1047 (2000). Panorama complains that the court's reasoning involves rewriting the parties' contract. Panorama maintains that the court should not have allowed concern for whether an insurer will have to pay to supersede the policy language.
The court's policy consideration is completely consistent with fundamental principles underlying insurance. Losses which the insured knows will occur are not insurable; the risk insured against "must involve the possibility of real loss which neither the insured nor the insurer has the power to avert or hasten." 7 Russ & Segalla, Couch on Insurance § 101:2 (3d ed.1997). In a similar vein, an insured should not be allowed to allow known property damage to continue and costs of repair or rebuilding to mount, waiting to file a claim until all damage is complete. And there is nothing inappropriate about requiring an insurance company to pay only for losses which it has contracted to insure, nor to protect it from paying for damage which the insured knows will occur and allows to happen before filing a claim.
I completely agree with the Court of Appeals' conclusion that the discovery rule should be applied in continuing damage situations where the property damage initially occurs and may continue for a time without the insured being aware it is happening. "Any other approach would either penalize unaware insureds or allow those who are aware of the condition to delay in repairing it until the insured property literally collapses. *924 The law does not condone waste." Panorama Vill., 99 Wash.App. at 279, 992 P.2d 1047.

"Hidden" Decay
The second issue in this case is what is meant by the term "hidden." The Allstate policy excludes losses caused by rot. However, as noted, collapse losses are covered if collapse if caused by "hidden decay." CP at 821. "Decay" means rot or "decomposition of organic matter as a result of bacterial, fungal, or insecticidal action, resulting in destruction or dissolution." 11 Russ & Segalla, Couch on Insurance § 153:91 (3d ed.1997) (citing Arkin v. Fireman's Fund Ins. Co., 228 Ga.App. 564, 566, 492 S.E.2d 314 (1997)); see also Whispering Creek Condo. Owner Ass'n v. Alaska Nat'l Ins. Co., 774 P.2d 176, 180-81 (Alaska 1989); Webster's Third New International Dictionary 584 (1993) ("rot" is synonymous with "decay"). Thus, because losses caused by "rot" are excluded, the "hidden decay" must run its course and result in collapse before there is a covered loss. If the decay is no longer hidden, and the structure is not yet in a state of collapse, there is no coverage. Further, the policy is intended to cover only the risk of direct physical loss involving collapse due to hidden decay, not damage resulting from hidden decay itself.
The issue is whether "hidden" simply means "out of sight," or whether it means "undisclosed" or "unknown." The term is not defined in the Allstate policy. "`Courts interpret insurance contracts as an average insurance purchaser would understand them and give undefined terms in these contracts their "plain, ordinary, and popular" meaning.'" Diaz v. Nat'l Car Rental Sys., Inc., 143 Wash.2d 57, 65-66, 17 P.3d 603 (2001) (quoting Kish v. Ins. Co. of N. Am., 125 Wash.2d 164, 170, 883 P.2d 308 (1994) (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990))).
The majority notes that there are multiple meanings of the term "hidden." The majority concludes that "hidden" is ambiguous because it has more than one reasonable meaningsaying that Panorama's proffered meaning is reasonable because it is one of the ordinary dictionary definitions. Majority at 916. This novel approach dictates that whenever the dictionary lists more than one ordinary meaning of a word, any one of the word's listed meanings is reasonable simply because it is one of the word's ordinary meanings listed in the dictionary. Thus, any word having multiple meanings is necessarily ambiguousand must be construed in the insured's favor. Under the majority's circular approach, the inquiry into reasonableness is a meaningless exercise.
"An ambiguity in an insurance policy is present if the language used is fairly susceptible to two different reasonable interpretations." Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 576, 964 P.2d 1173 (1998). The reasonableness of the interpretations is determined with regard to the contract as a whole. See State Farm Gen. Ins. Co. v. Emerson, 102 Wash.2d 477, 484, 687 P.2d 1139 (1984). If a term is ambiguous, and the ambiguity is not resolved by extrinsic evidence of the parties' intent, the term is construed in favor of the insured.
As the majority indicates, there are multiple ordinary meanings of the word "hidden." It is defined as "[1] being out of sight or off the beaten track : CONCEALED ... [2] UNEXPLAINED, UNDISCLOSED, OBSCURE, SECRET ... [3] obscured by something that makes recognition difficult : covered up." Webster's Third New International Dictionary 1065 (1993). However, as the Court of Appeals held, while the term "hidden" has more than one meaning, it does not have more than one reasonable meaning in the context of this insurance policy. If "hidden" simply means "out of sight" as Panorama contends, the insured could simply allow known decay to continue behind walls to the point of collapse simply because the decay is not visible. Panorama Vill., 99 Wash.App. at 281, 992 P.2d 1047. This definition "would permit insureds to turn their backs on maintenance problems to keep something `hidden.'" 35 Tort & Ins. L.J. at 74. Moreover,
[t]he meaning of the term "hidden" becomes clearer when one considers why decay or insect damage must be hidden for there to be coverage. There is no coverage for decay or insect damage. There is coverage for a collapse, but a collapse does not occur for several months or years after *925 decay, insect damage, or both begins. Hence, the beginning of a collapse loss is an uncovered event.
In other words, if an insured discovers the decay or insect damage soon enough, a collapse will not have occurred and there would be no coverage. If decay or insect damage were not hidden, the eventual collapse would not be a fortuitous event.
Id. Panorama's definition would allow insureds to ignore damage which is not covered under this policy and delay any action until the uncovered damage from rot becomes a covered loss, collapse. Panorama's definition is inconsistent with the coverage and exclusion provisions as a whole, and inconsistent with fundamental insurance principles.
Because the only reasonable definition of "hidden" in the context of this policy is "undisclosed" or "unknown," there is no ambiguity and the principle of construing the term in favor of the insured therefore does not apply, as the Court of Appeals held.
Finally, the majority's precise holding is that where the covered loss is the risk of direct physical loss from hidden decay, the one-year period in which to commence suit begins on the earlier of the date of actual collapse, or the date when the decay posing the risk of actual collapse is no longer obscured from view. Majority at 912. Contrary to the majority's holding, the covered loss is not the risk of physical loss from hidden decayit is the risk of physical loss involving collapse due to hidden decay. Hidden decay is not a covered event. Moreover, the first of the two time periods identified by the majority essentially equates the policy to an actual collapse policyinvolving the actual falling down of the structurecontrary to the policy language and the trial court's unchallenged ruling that an actual falling-down collapse is not required. The second of these two periods is dependent upon the majority's conclusion that "hidden" means out of sight. That is, as explained above, an untenable interpretation of the policy language.

Conclusion
Allstate has presented considerable evidence that Panorama knew about the problems giving rise to its claim years before making that claimthat Panorama specifically knew or should have known of problems with structural integrity due to rot. I would affirm the Court of Appeals' holding that a discovery rule applies, because that is the best way to effectuate the parties' intended bargain, and would remand this case for resolution of factual issues as to when Panorama knew or should have known of substantial decay and structural damage.
CHAMBERS, J., concurs.
NOTES
[1] Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 53, 811 P.2d 673 (1991).
[2] Particularly injurious to Allstate's argument is the fact that the portion of the policy which provides coverage for employee dishonesty DOES contain a discovery provision. Clerk's Papers at 832.
[1] The trial court ruled, and that ruling is unchallenged on appeal, that a collapse loss does not require that the structure actually fall down. The language of the policy states the covered loss as being "the risk of direct physical loss involving collapse," Clerk's Papers (CP) at 821 (emphasis added), and thus actual collapse is not required.